# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45599

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | **Boise, May 2019 Term** |
| v. | ) | |
| | ) | |
| ADAM DAVID BODENBACH, | ) | **Filed: September 3, 2019** |
| | ) | |
| Defendant-Appellant. | ) | **Karel A. Lehrman, Clerk** |
| | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Steven J. Hippler, District Judge.

The judgment of the district court is <u>affirmed</u>.

Ferguson Durham, PLLC, Boise, for appellant Adam David Bodenbach. Craig H. Durham argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent State of Idaho. Kenneth K. Jorgensen argued.

_____

STEGNER, Justice.

Adam David Bodenbach (Bodenbach) appeals from the judgment of conviction entered against him in Ada County District Court for first-degree murder and possession of cocaine. First, Bodenbach argues that the district court's "initial aggressor" jury instruction created reversible error because the instruction was unnecessary, confusing, and misstated Idaho law. Second, Bodenbach appeals the denial of his motion to suppress statements he made shortly after the shooting during a police interview. He argues that he did not knowingly and intelligently[1] waive his *Miranda* rights because he was under the influence of drugs. Finally, Bodenbach argues that the district court abused its discretion when it sentenced him. For the reasons set forth in this opinion, we affirm Bodenbach's judgment of conviction and sentence.

---

[1] Ordinarily, in order to waive one's *Miranda* rights, the waiver must be made knowingly, intelligently, and voluntarily. However, in this case, Bodenbach's counsel has conceded that the waiver was voluntary. Consequently, the analysis is limited to whether Bodenbach's waiver was knowing and intelligent.

# I. FACTUAL AND PROCEDURAL BACKGROUND

In the early morning of January 6, 2017, Bodenbach shot and killed Ryan Harrison Banks (Banks) at the Park Village Apartments in Boise, Idaho. At the time of the killing, Bodenbach resided in a two-bedroom apartment that he shared with Jacob Kimsey (Kimsey). Banks lived in the same complex as Bodenbach and Kimsey but in an apartment that was across the courtyard from theirs.

On January 5, 2017, sometime between 8:00 and 10:00 p.m., Bodenbach purchased and injected himself with cocaine. Bodenbach claimed that Kimsey also injected himself with cocaine around that time. Kimsey and Banks then drove to a convenience store to purchase alcohol before the two of them returned to the apartment Kimsey shared with Bodenbach. Around 10:00 p.m., Bodenbach and Kimsey began arguing about whether Bodenbach could borrow Kimsey's car. The argument escalated and Kimsey shoved Bodenbach away from him. Banks intervened and pushed Bodenbach back into Bodenbach's bedroom and onto the bed. Banks was on top of Bodenbach pinning him to the bed. Bodenbach testified that Banks was choking him.[2]

Kimsey pulled Banks off Bodenbach and walked him back to Banks' apartment across the courtyard. Kimsey testified that Banks was emotional after the altercation with Bodenbach. Kimsey stayed with Banks for approximately five minutes attempting to calm him down.

Once he believed that Banks was no longer agitated, Kimsey went to check on Bodenbach. When Kimsey arrived at the apartment, he saw Bodenbach flipping his mattress over and throwing clothes around in an effort to locate his pistol. Bodenbach accused Banks of stealing his gun. Kimsey decided to return to Banks' apartment, assuming Bodenbach would calm down.

According to Kimsey, Banks was still emotional upon his return. There is conflicting evidence as to whether Banks had a knife on him at this time. Kimsey testified during trial that he did not see a knife on Banks at any time that night. However, during his interview with the police the night of Banks' death, Kimsey stated that Banks had been carrying a knife before he was shot.

---

[2] There was a considerable difference in size between Bodenbach and Banks. Bodenbach is 5'9" tall and weighed 150 pounds. Banks was over six feet tall and weighed more than 200 pounds.

Bodenbach eventually found his gun. He testified he decided to go to Banks' apartment to check on Kimsey, as he was worried Banks might harm him. Bodenbach took his pistol and walked across the courtyard to Banks' apartment.

Kimsey's and Bodenbach's stories diverge at this point. Bodenbach testified at trial that he knocked on Banks' door, identifying himself and falsely saying that the police were with him. Bodenbach claimed that he stated this because he was concerned about what Banks might do. However, Kimsey testified as follows: He did not hear Bodenbach knocking. Rather, he and Banks had decided to go outside to smoke cigarettes. Kimsey opened the door for Banks and Banks walked out first, pausing after walking through the door. Once Kimsey walked through the door, he could see Bodenbach pointing a gun in their direction and heard Bodenbach yell at Banks, "You thought I was fucking kidding. You think I'm a fucking punk." Bodenbach testified that he never raised the gun but rather had it in his jacket pocket.

Banks said nothing in response to Bodenbach but lunged towards him. Once Banks moved towards Bodenbach, Kimsey could not see Bank's front or Bodenbach's gun. Bodenbach claimed that prior to Banks lunging at him, Banks reached down to his waistband and pulled out a knife. Banks pushed Bodenbach into a pillar. Bodenbach claimed it was at this time that he reached for his gun and shot Banks. Banks fell down. Bodenbach ran off. The shooting occurred shortly after midnight.

As he was returning to his apartment, Bodenbach called 911 and told the operator he had shot someone in the leg. (Banks had been shot in the chest.) Bodenbach then returned to his apartment and set his gun on a table. He testified that he was agitated and decided to take some Xanax to calm down. After purportedly taking the medication, Bodenbach went to check on Banks.

The Boise Police Department responded to multiple 911 calls. The officers encountered Bodenbach talking on a phone and holding a knife, which he later claimed to have found on the ground near where he shot Banks. He was ordered to drop the knife and was handcuffed. Banks was located in a neighbor's apartment. He was pronounced dead by paramedics at the scene.

Once Bodenbach was arrested, Bodenbach complained of pain in his neck and back. He was transported to St. Alphonsus Regional Medical Center where he was examined and held for several hours. Around 2:00 a.m. on January 6, 2017, Boise Police Detective Jason Pietrzak (Pietrzak) came to the hospital to interview Bodenbach. Bodenbach later testified he did not

3

remember being interrogated by Pietrzak. After the interview, Bodenbach was discharged from the hospital and booked into the Ada County Jail.

The State charged Bodenbach with first-degree murder, the commission of a crime with a firearm,[3] and possession of cocaine. Before trial, Bodenbach filed a motion to suppress statements he made during the police interview at the hospital, arguing that he did not knowingly and intelligently waive his *Miranda* rights because he was under the influence of Xanax. The district court denied the motion, finding that Bodenbach was not under the influence of Xanax, and, even if he were, he knowingly and intelligently waived his *Miranda* rights.

The case proceeded to trial. The State and Bodenbach presented their cases, during which Bodenbach did not testify. After both parties had rested, the district court stated it was considering giving an instruction to the jury that would not allow Bodenbach to claim self-defense if he had been the "initial aggressor." Neither party had offered such a proposed instruction, nor is such an instruction contained in the Idaho Criminal Jury Instructions (ICJI).

The district court ruled that it intended to give an "initial aggressor" jury instruction, but it allowed the defense to reopen its case to allow Bodenbach the opportunity to testify in his own defense. Bodenbach took the stand and testified. During the instruction conference, Bodenbach's counsel made a general objection to the district court giving an "initial aggressor" instruction. The district court asked defense counsel if he objected to the language contained in the proposed instruction, to which he replied "no." Over the objection of defense counsel, the district court provided the jury with an instruction outlining when an initial aggressor is entitled to claim self-defense—Instruction No. 28.

The jury found Bodenbach guilty of first-degree murder, the use of a firearm in the commission of a crime, and possession of cocaine. The district court sentenced Bodenbach to life in prison with twenty-five years fixed for the murder (including the sentencing enhancement for use of a firearm) and to a concurrent seven years with three years fixed for the possession of a controlled substance. Bodenbach timely appealed.[4]

---

[3] Violation of Idaho Code section 19-2520, use of a firearm or deadly weapon during the commission of a crime, is not a substantive crime; rather, it is a sentencing enhancement if the defendant is found guilty of the underlying crime. However, pursuant to the statute, it must be charged separately in the information.
[4] Bodenbach has not appealed his conviction or sentence for possession of cocaine.

## II. ANALYSIS

**A.    There was no reversible error in the district court's giving of the initial aggressor jury instruction.**

After the defense reopened its case and Bodenbach testified, the district court provided to counsel a proposed jury instruction regarding what an initial aggressor needed to do in order to claim self-defense. Bodenbach's counsel gave a general objection to the initial aggressor instruction. The district court overruled the general objection and provided the instruction to the jury.

On appeal, Bodenbach argues that the district court erred in instructing the jury that a defendant was not entitled to claim self-defense if the defendant was the initial aggressor. Bodenbach further argues that the initial aggressor instruction misstated Idaho law, was unclear and vague, and improperly reduced the State's burden to prove that the homicide was unlawful.

The State argues that the issue was not preserved below because Bodenbach failed to make any of these arguments to the district court. The State contends that making a general objection to the instruction as a whole, but not objecting on a specific ground, was not enough to preserve the issue on appeal. Further, the State argues that Bodenbach failed to properly claim, let alone prove, fundamental error.

1. <u>The only issue preserved is whether an initial aggressor instruction is appropriate under Idaho law</u>.

The threshold issue is whether Bodenbach properly preserved the argument regarding the initial aggressor jury instruction. "This Court will not consider issues raised for the first time on appeal." *State v. Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017) (quoting *Mickelsen Constr., Inc. v. Horrocks*, 154 Idaho 396, 405, 299 P.3d 203, 212 (2013)).

Here, Bodenbach's counsel specifically objected to the giving of the instruction. However, the discussion between the district court and Bodenbach's counsel is informative.

> THE COURT: [I]f I do give a first aggressor instruction, do you have a problem with the language of this one?
>
> [DEFENSE COUNSEL]: No.
>
>         . . . .
>
> THE COURT: Okay. I'll let you be heard on the initial aggressor law.
>
> [DEFENSE COUNSEL]: Well, I'm just going to raise a general objection.
>
>         . . . .

5

[DEFENSE COUNSEL]: . . . [T]his law dates back to 1953 or something, and I haven't seen a pattern instruction, I haven't seen a statute, I haven't seen anything that talks about it. So that's my objection.

THE COURT: Just the oldness of the cases that do talk about it, the antiquity of those?

[DEFENSE COUNSEL]: Yeah, and that our Supreme Court hasn't seen fit to gin up a pattern instruction that deals with it. I don't know that they think it's therefore applicable, but…

. . . .

THE COURT: Okay. Well, I think it is the law.

Thus, the question remains whether the general objection above is sufficient to preserve the issue of whether the language of the instruction misstated Idaho law. This Court recently expounded on the preservation of issues in *State v. Gonzalez*, 165 Idaho 95, 98, 439 P.3d 1267, 1270 (2019), *reh'g denied* (May 17, 2019). In that case, this Court held that an appellant may polish an argument made at the district court as long as he is putting forth the same legal issue and same position on the issue.

Here, the only issue preserved is whether a jury instruction regarding an initial aggressor's right to claim self-defense is appropriate under Idaho law. The discussion between defense counsel and the district court illustrates that the only issue before the court was whether the instruction, as a whole, was in accord with Idaho law. However, issues regarding specific language used in the jury instruction, whether the language was confusing and vague, and whether it improperly reduced the burden for the State were not preserved. These issues were not argued below to the district court. In fact, defense counsel specifically stated that he had no issue with the language used in the instruction. This is not the "polishing" envisioned under *Gonzalez*. Accordingly, the issue of whether an initial aggressor instruction is appropriate has been preserved, but the remaining arguments made on appeal have not. Consequently, those issues would only be reviewable under the fundamental error test because defense counsel did not preserve an objection to the instruction on those grounds. *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010).

2. In order for an initial aggressor to claim self-defense he must show he "endeavored to decline any further struggle before the homicide was committed."

This Court exercises free review over the propriety of jury instructions. *Hennefer v. Blaine Cty. Sch. Dist.*, 158 Idaho 242, 253, 346 P.3d 259, 270 (2015). The standard for whether a

particular instruction "should or should not have been given is whether there is evidence at trial to support the instruction[.]" *Id.*

At the time of Bodenbach's trial, the justifiable-homicide statute read, in relevant part:

Homicide is also justifiable when committed by any person in either of the following cases:

. . . .

3. When committed in the lawful defense of such person . . . but such person . . . *if he was the assailant or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed*[.]

I.C. § 18-4009.3 (1972) (italics added) (amended 2018).[5] Pursuant to this statute, the Court of Appeals has held that a defendant "is not entitled to claim self-defense or justify a homicide when he or she was the aggressor or the one who provoked the altercation in which another person is killed, unless such person in good faith first withdraws from further aggressive action." *State v. Turner*, 136 Idaho 629, 634–35, 38 P.3d 1285, 1290–91 (Ct. App. 2001) (citing *State v. Owen*, 73 Idaho 394, 413–14, 253 P.2d 203, 213–14 (1953), *overruled on other grounds by State v. Shepard*, 94 Idaho 227, 486 P.2d 82 (1971)). Although it is generally true that there is no requirement to retreat in order to claim self-defense (*see* ICJI 1519; *see generally State v. McGreevey*, 17 Idaho 453, 105 P. 1047 (1909)), section 18-4009.3 establishes an exception when one is the initial aggressor. *See* I.C. § 18-4009.3. Therefore, it is clear under Idaho law that an initial aggressor is only entitled to self-defense if he withdraws from further aggressive action.

The facts of this case support the district court's decision to provide an initial aggressor instruction. Bodenbach crossed the courtyard to Banks' apartment with a gun. Kimsey testified that when he and Banks walked out of Banks' apartment, Bodenbach had his gun raised in their direction and Bodenbach yelled obscene and threatening statements at Banks. If a jury were to find these facts to be true, Bodenbach would be considered the initial aggressor. Therefore, the district court did not err in instructing the jury that an initial aggressor is not entitled to self-defense unless he withdraws from further aggressive action.

---

[5] The statute was amended in 2018; the subsections were renumbered but the relevant language remains unchanged. 2018 Idaho Sess. Laws 500. The language formerly contained in Idaho Code section 18-4009.3 is now contained in Idaho Code section 18-4009(1)(c).

3. Instruction No. 28 does not rise to the level of fundamental error.

"When a defendant fails to object to a jury instruction, [this Court] review[s] the jury instruction for fundamental error." *State v. Adamcik*, 152 Idaho 445, 472, 272 P.3d 417, 444 (2012). The fundamental error test requires:

> (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*Perry*, 150 Idaho at 226, 245 P.3d at 978.

The initial inquiry is whether the jury instruction was erroneous at all. *State v. Skunkcap*, 157 Idaho 221, 227, 335 P.3d 561, 567 (2014); *State v. Carver*, 155 Idaho 489, 493, 314 P.3d 171, 175 (2013). This Court reviews "the trial court's jury instructions *de novo* to determine 'whether, when considered as a whole, they fairly and adequately present the issues and state the applicable law.'" *State v. Dunlap*, 155 Idaho 345, 364, 313 P.3d 1, 20 (2013) (quoting *Adamcik,* 152 Idaho at 472, 272 P.3d at 444). "Whether the instruction was erroneous will depend upon how a reasonable juror would have interpreted the instruction." *Skunkcap*, 157 Idaho at 227-28, 335 P.3d at 567-68 (citing *State v. Hairston,* 133 Idaho 496, 515, 988 P.2d 1170, 1189 (1999)).

Bodenbach argues that Instruction No. 28 was unnecessary, confusing, misstated Idaho law, and violated his due process rights by reducing the State's burden of proof. Instruction No. 28 states, in relevant part,

> To have the benefit of self-defense or the defense of another, the circumstances justifying a killing must be such as to render it unavoidable. If you believe from the evidence, and beyond a reasonable doubt, that the defendant was the initial aggressor to raise the threat or specter of deadly force with the apparent intent to take the life of the said deceased or to do him such serious bodily injury as might result in death, then he would not be permitted to excuse the killing on the ground of self-defense or the defense of another, even though he should thereafter have been compelled to act in his own defense or the defense of another, unless you find all of the following occurred:
>
> 1. The defendant, in good faith first, withdraws from further aggressive action, and;
>
> 2. The defendant communicates his withdrawal from further aggressive action to the victim by word or act.

8

The instruction imposes a requirement to withdraw and to communicate that withdrawal to the victim. It is clear under the justifiable-homicide statute that some type of withdrawal is necessary for an initial aggressor to claim self-defense. What is not clear is to what extent that "withdrawal" must be communicated. Bodenbach argues that Idaho Code section 18-4009.3 does not contain a communication requirement; rather, it merely requires that an initial aggressor attempt to stop the initial assault.

As a starting point, there is no pattern jury instruction regarding an "initial aggressor." The closest example is the instruction for participants in mutual combat. ICJI 1521. That pattern jury instruction states that for a participant in mutual combat to claim self-defense, the person must have "really and in good faith endeavored to decline further combat, and has fairly and clearly informed the adversary of a desire for peace and that the person has abandoned the contest." ICJI 1521. This model instruction cites Idaho Code section 18-4009.3 as its authority. Given the close proximity of "assailant" and "mortal combat" in section 18-4009.3, it logically follows that the same requirements to withdraw from mutual combat (or "mortal combat") would apply to the conduct of an initial aggressor. However, section 18-4009.3 contains no explicit requirement to communicate the withdrawal. Nevertheless, the model instruction for mutual combat (ICJI 1521) imposes a communication requirement. As pattern jury instructions are presumptively correct, we presume this to be an accurate statement of Idaho law. *State v. Mann*, 162 Idaho 36, 42, 394 P.3d 79, 86 (citing *McKay v. State*, 148 Idaho 567, 571 n.2, 225 P.3d 700, 704 n.2 (2010)). Given that the elements provided by the district court mirror the approved language, the district court did not err.

As further support, a communication requirement can be derived from the language of the statute. When interpreting statutes, the primary goal

> is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*State v. Amstad*, 164 Idaho 403, 405, 431 P.3d 238, 240 (2018) (quoting *State v. Dunlap*, 155 Idaho 345, 361–62, 313 P.3d 1, 17–18 (2013)). This Court often turns to dictionary definitions

9

"[t]o ascertain the ordinary meaning of an undefined term in a statute . . . ." *Arnold v. City of Stanley*, 158 Idaho 218, 221, 345 P.3d 1008, 1011 (2015) (citing *Hap Taylor & Sons, Inc. v. Summerwind Partners, LLC,* 157 Idaho 600, 614, 338 P.3d 1204, 1218 (2014)). The statute need not be ambiguous to resort to dictionaries to determine the ordinary meaning of a term. *See State v. Schulz*, 151 Idaho 863, 867, 264 P.3d 970, 974 (2011).

One word that implies a communication requirement in the statute is "decline." According to Merriam-Webster's dictionary, to decline is "to refuse to undertake, undergo, engage in, or comply with." *Decline*, Merriam-Webster's Collegiate Dictionary 299 (10th ed. 1993). Further, "to refuse" is "to show or express an unwillingness to do or comply[.]" *Refuse*, Merriam-Webster's Collegiate Dictionary 983–84 (10th ed. 1993). When considering these definitions, it appears there is a requirement to "show or express" an unwillingness to engage in further struggle.

In addition, the requirement to communicate the withdrawal may also be inferred from the word "endeavor." Merriam-Webster's dictionary defines "endeavor" as "to attempt (something, such as the fulfillment of an obligation) by exertion of effort." *Endeavor,* Merriam-Webster's Collegiate Dictionary 381 (10th ed. 1993). Coupling the definitions "endeavor" and "decline" yields the following: "an effort to show or express a refusal to engage in." Accordingly, the district court did not err in instructing the jury regarding a communication element for an initial aggressor to claim self-defense.

Finally, requiring an initial aggressor to communicate his withdrawal from further aggressive action promotes the intended purpose of the statute. The language of the statute is based on the principle that a defendant cannot claim self-defense when the victim of the aggressive act is entitled to respond with lawful force. The defendant should not be able to claim self-defense for creating the necessity for the victim's use of self-defense.

However, this does not mean the instruction is without problems. First, the instruction is overly wordy and not the model of clarity. The second sentence contains roughly one hundred words and does not flow in a smooth fashion. The jury was expected to untangle the lengthy sentence as to the requirements of self-defense for an initial aggressor.

Second, the instruction stated, "the circumstances justifying a killing must be such as to render it unavoidable." This Court has previously rejected a similar instruction that stated that a defendant is only entitled to self-defense if he "has done everything in his power to avoid [the

10

killing]." *McGreevey*, 17 Idaho at 467, 105 P. at 1051. This Court held that the test to be applied is whether the person acted "as a reasonable and prudent man would be likely to act under similar conditions and circumstances[.]" *Id.* Therefore, the first sentence of the jury instruction was in error.

Nevertheless, the fundamental error test has not been satisfied. The first prong of *Perry* requires the error to be a constitutional violation. *Perry*, 150 Idaho at 228, 245 P.3d at 980. An erroneous jury instruction violates due process if it relieves the State of the burden of proving every element of the crime beyond a reasonable doubt. *State v. Draper*, 151 Idaho 576, 588, 261 P.3d 853, 865 (2011).

Bodenbach argues that the jury instruction violated his due process rights because it impermissibly reduced the State's burden to prove that the killing was unlawful. Bodenbach recognizes that the Court of Appeals has held that it is not a constitutional requirement for a State to disprove a defendant's affirmative defenses. *State v. Jimenez*, 159 Idaho 466, 470–71, 362 P.3d 541, 545–46 (Ct. App. 2015). Although not explicitly, this Court held similarly in *State v. Mubita*, 145 Idaho 925, 942, 188 P.3d 867, 884 (2008). This holding also appears to be supported by decisions from the United States Supreme Court. *See, e.g.*, *Martin v. Ohio*, 480 U.S. 228, 236 (1987) (holding that Ohio's practice of requiring defendants to prove self-defense did not unconstitutionally shift the burden of proof from the state to the defendant).

Notably, neither of the cases by this Court or the Court of Appeals concerned a murder conviction. Under the definition of murder, the State must prove beyond a reasonable doubt that the killing was not justified. I.C. § 18-4001; ICJI 701. Therefore, the lack of justification, i.e., whether the defendant killed in self-defense, is an essential element for a murder conviction. Accordingly, the general rule announced in *Jimenez* and *Mubita* does not apply to cases concerning murder convictions; the first prong of *Perry* is satisfied, as the erroneous language in the instruction would have reduced the State's burden of proving the "unlawful" element for a murder conviction. *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).

Bodenbach easily satisfied the second prong of *Perry*. The error is clear from the record and was not a tactical decision because defense counsel attempted to prevent the jury from being instructed regarding an initial aggressor.

Nonetheless, Bodenbach has not satisfied the third prong. Given our recent clarification in *State v. Miller,* 165 Idaho 115, 120, 443 P.3d 129, 134 (2019), a defendant must demonstrate

11

that the error actually affected the outcome of the trial proceedings. Here, it is unlikely that the single sentence in the jury instruction actually affected the outcome of the trial proceedings. Other instructions given by the district court clearly outlined the law that the jury was required to apply. In order for the jury instruction to have been applicable, the jury would have had to find that Bodenbach was the initial aggressor. Then, in order to have the benefit of self-defense, the facts would have had to establish that Bodenbach's conduct satisfied the elements for an initial aggressor to claim self-defense. There is no evidence that Bodenbach attempted to withdraw from further struggle, let alone communicate that withdrawal to Banks. Therefore, Bodenbach failed to establish that the error actually affected the outcome of the trial. Accordingly, the jury instruction did not rise to the level of fundamental error.

**B.      The district court did not err in denying Bodenbach's motion to suppress evidence because his waiver was knowing and intelligent.**

Bodenbach claimed he took Xanax to calm his nerves shortly after shooting and killing Banks. Once Bodenbach was arrested, he complained of pain in his neck and back, purportedly due to his earlier altercation with Banks. He was transported to the hospital because of his complaints. When the paramedics arrived, they described Bodenbach as alert to time, place, event, and person. In addition, Bodenbach was "anxious and agitated but not aggressive" and his vital signs were stable. Further, he scored a fifteen on the Glasgow Coma Scale (GCS), the highest score available, indicating "no obvious impairment" and that Bodenbach was "at the highest level of function."

Officer Devin Ellis accompanied Bodenbach to the hospital. She testified that Bodenbach was capable of (1) answering the paramedic's questions promptly and appropriately, (2) articulating where he was in regard to pain, and (3) requesting medication. He was able to give his name and spell it and give his detailed health history, date of birth, addresses, and social security number.

Bodenbach arrived at the hospital around 12:55 a.m., approximately one hour after he claims to have ingested Xanax. The hospital reports indicated that Bodenbach was alert and oriented and that his GCS score was still fifteen. There is one moment that Bodenbach asks Officer Ellis whether he was in a hospital or a "jail med room," but he quickly clarified that the reason he was asking was that the rooms looked similar in his experience. When reviewing the audio, it does not appear that Bodenbach had trouble speaking, nor was his speech slurred. However, Bodenbach was not given a toxicology screen at the hospital.

12

Around 2:00 a.m., approximately two hours after Bodenbach claimed to have ingested Xanax, Detective Pietrzak arrived to interview Bodenbach. According to Dr. Dawson, the State's pharmacology expert, any signs of intoxication from the Xanax would have been "very obvious" at this time. Dr. Dawson testified that the common signs of intoxication from Xanax include "central nervous system depression, lethargy, cognitive impairment, inability to form thought or to respond appropriately to questions, [and] problems with balance." After reviewing the audio recording of the interview, paramedic records, and hospital records, Dr. Dawson testified in his opinion that Bodenbach was not exhibiting signs of someone who was impaired by any intoxicant.

Upon making contact with Pietrzak, Bodenbach stated that he wanted to tell Pietrzak the events of the night. At that time, Pietrzak recited the *Miranda* warnings to Bodenbach. When Pietrzak stated that Bodenbach had the right not to answer any questions, Bodenbach responded, "Fifth Amendment thing" and "Plead the Fifth." Bodenbach indicated that he still wished to speak with Pietrzak. Pietrzak asked if Bodenbach understood the rights that had been read to him and Bodenbach replied, "Yeah . . . Anything I say will incriminate me." At that time, Bodenbach began to tell his version of the night's events.

Prior to trial, Bodenbach moved to suppress the statements he had made while he was purportedly under the influence of Xanax. The district court denied his motion to suppress. On appeal, Bodenbach argues that he made those statements under an invalid waiver of his *Miranda* rights due to him being under the influence of Xanax.

"The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *State v. Moore*, 164 Idaho 379, 381, 430 P.3d 1278, 1280 (2018) (quoting *State v. Page*, 140 Idaho 841, 843, 103 P.3d 454, 456 (2004)).

In *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), the United States Supreme Court held that police must inform individuals of their Fifth Amendment rights prior to conducting custodial interrogations. *State v. Doe*, 137 Idaho 519, 523, 50 P.3d 1014, 1018 (2002). These rights may be waived, but waiver "must be knowing, intelligent, and voluntary." *Adamcik*, 152 Idaho at 468, 272 P.3d at 440. "In determining whether a defendant has voluntarily, knowingly and intelligently waived his *Miranda* rights, this Court must consider the totality of the

13

circumstances." *Id.* The totality of the circumstances may include a review of "the background, experience, and conduct of the accused." *See State v. Brennan*, 123 Idaho 553, 556, 850 P.2d 202, 205 (Ct. App. 1993) (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). "The trial court's conclusion that a defendant made a knowing and voluntary waiver of his *Miranda* rights will not be disturbed on appeal where it is supported by substantial and competent evidence." *State v. Luke*, 134 Idaho 294, 297, 1 P.3d 795, 798 (2000).

Here, there is no dispute that Bodenbach was in custody at the time of the interview. Further, it appears that Bodenbach's counsel conceded that the waiver was "voluntary," meaning that there was no coercion. Therefore, the issue is limited to whether Bodenbach knowingly and intelligently waived his rights.

There were numerous facts found by the district court that support a finding that Bodenbach knowingly and intelligently waived his *Miranda* rights. First, he was thirty-years-old at the time of the interview. In addition, he had two prior arrests so he was familiar with the criminal process. This type of background and experience supports the district court's finding of a knowing and intelligent waiver.

Another factor to consider was Bodenbach's purported ingestion of Xanax prior to the interview. Although there is minimal case law from this Court describing how intoxication is to be treated concerning waiver, we have previously stated that intoxication does not make statements *per se* involuntary; rather, it is just one factor to consider in the totality of the circumstances. *State v. Mitchell*, 104 Idaho 493, 499, 660 P.2d 1336, 1342 (1983). Although the issue in this case is not whether the statements were involuntary, the treatment of intoxication would likely apply to whether a waiver was knowing and intelligent as well.

For example, in *State v. Custodio*, 136 Idaho 197, 202, 30 P.3d 975, 980 (Ct. App. 2001), the Court of Appeals held that, even though the defendant was under the influence of alcohol, he was not so impaired as to invalidate his waiver of his *Miranda* rights. In that case, the district court relied on evidence that the defendant was fully responsive to questioning; his answers were coherent and understandable; and he was capable of a substantial amount of motor coordination. *Id.* Although, the defendant in *Custodio* was found to be "very intoxicated," his conduct during the interview demonstrated that he was not so impaired as to invalidate his waiver. *Id.*

14

Here, the district court specifically found that Bodenbach was not under the influence of Xanax. This finding is supported by substantial and competent evidence. The only evidence to support that Bodenbach had taken Xanax was his own statement. There was no Xanax located during the search of his residence, and there is no indication in his medical records that he reported his consumption of Xanax to the hospital. Further, Dr. Dawson testified that, given the amount Bodenbach claimed to have ingested, it would have been obvious that he was impaired. Tellingly, the paramedics, Officer Ellis, and Pietrzak all testified that Bodenbach did not exhibit any obvious impairment. In addition, at the hospital Bodenbach complained of being anxious and requested Xanax. The district court appropriately inferred that if Bodenbach's anxiety had been so high as to request Xanax, it was unlikely that he was under the influence of Xanax at the time of his request.

Despite its finding that Bodenbach was not under the influence of Xanax, the district court also found that, assuming Bodenbach had ingested Xanax, Bodenbach still knowingly and intelligently waived his *Miranda* rights. This finding is also supported by substantial and competent evidence and the totality of the circumstances. There is an audio recording of Bodenbach's conversations with paramedics, Officer Ellis, and Pietrzak, spanning approximately four hours after Bodenbach had purportedly ingested Xanax. During Bodenbach's many conversations, Bodenbach was alert, clear, responsive, and able to answer questions appropriately. There is no evidence of slurred speech or worsening speech as time progressed. Bodenbach was able to give linear answers to questions and recite medical history and personal information, such as addresses and phone numbers, with ease and speed. Similar to the defendant in *Custodio*, even if Bodenbach were impaired, he was not so impaired as to make his waiver invalid.

In addition, the district court found that Bodenbach expressed understanding of the criminal consequences of his actions, including the consequences of his waiver. Bodenbach made several comments during his interview that demonstrated this understanding. He accurately identified one of the *Miranda* rights read to him as the "Fifth Amendment thing." Further, when asked whether he understood his *Miranda* rights, Bodenbach responded, "Yeah. . . Anything I say will incriminate me."[6] Additional comments that shed light on his understanding of the

---

[6] Rarely does a defendant as cogently or succinctly identify the pitfalls of speaking to the police. Bodenbach clearly understood the purpose of the *Miranda* warning.

15

criminal process include Bodenbach stating he was "going to lawyer up" if Pietrzak twisted his words. He also tellingly refused to give consent to the search of his apartment without a warrant.

The district court noted certain times in which Bodenbach sounded tired and experienced some confusion during the interview. However, the district court found that these minor instances were not enough to find that Bodenbach was so impaired as to invalidate his waiver. The district court relied on testimony from Dr. Dawson, who stated that the "extreme stress of the evening likely released a significant amount of adrenaline which, as it wore off, caused sedation which, combined with the early hour of the morning, resulted in some confusion." Further, whenever Bodenbach experienced moments of confusion, he was quickly reoriented. The existence of conflicting evidence does not invalidate the district court's findings that Bodenbach was not so impaired that he could not have waived his *Miranda* rights.

Finally, the medical records support the district court's findings. Bodenbach's GCS score was a fifteen, demonstrating that there was no apparent impairment. Reports from the paramedics and the hospital indicate that Bodenbach was aware of time, place, situation, and person.

Given the totality of circumstances, including Bodenbach's age, familiarity with the criminal process and *Miranda* rights, and cogent discussions, Bodenbach made a knowing and intelligent waiver of his *Miranda* rights. Therefore, the district court did not err in denying Bodenbach's motion to suppress.

**C.** **The district court did not abuse its discretion in sentencing Bodenbach to a term of not less than twenty-five years, followed by an indeterminate life sentence.**

The district court sentenced Bodenbach to life in prison, with twenty-five years fixed for the first-degree murder charge, which included the firearm sentencing enhancement. On appeal, Bodenbach alleges the district court abused its discretion because it ignored or discounted significant mitigating factors before imposing what he argues is an unreasonable sentence. The State responds that Bodenbach's argument is based on facts other than those found by the district court and that Bodenbach failed to claim that the district court's other findings were erroneous.

"When reviewing whether a sentence is excessive, [this Court] review[s] all the facts and circumstances in the case and focus[es] on whether the trial court abused its discretion in fixing the sentence." *State v. Baker*, 136 Idaho 576, 577, 38 P.3d 614, 615 (2001). "Where the sentence imposed by a trial court is within statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion." *State v. Miller*, 151 Idaho 828, 834, 264 P.3d

935, 941 (2011) (quoting *State v. Windom*, 150 Idaho 873, 875, 253 P.3d 310, 312 (2011)). When reviewing a lower court's decision for an abuse of discretion, this Court must analyze "whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). "In deference to the trial judge, this Court will not substitute its view of a reasonable sentence where reasonable minds might differ." *State v. Stevens,* 146 Idaho 139, 148–49, 191 P.3d 217, 226–27 (2008).

 "When appealing a sentence as an abuse of discretion, the appellant 'must establish that, under any reasonable view of the facts, the sentence was excessive considering the objectives of criminal punishment.'" *State v. Matthews*, 164 Idaho 605, 608, 434 P.3d 209, 212 (2019) (quoting *State v. Varie*, 135 Idaho 848, 856, 26 P.3d 31, 39 (2001)). "Those objectives are (1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrong-doing." *Id.*

Here, the district court did not abuse its discretion in sentencing Bodenbach in the way that it did. First, it is clear from the record that the district court appropriately perceived sentencing as a matter of discretion and that it acted consistently with the legal standards before it. Specifically, the district court stated:

> In an exercise of my discretion in sentencing, I have considered the *Toohill* factors, including the nature of the offense and the character of the offender, as well as the information in mitigation and in aggravation. I've also considered the objectives of sentencing to include the protection of society, first and foremost, but also achieving deterrence, the potential for rehabilitation and the need for retribution or punishment.

Further, the district court acted within the boundaries of its discretion. Idaho Code section 18-4004 states that the punishment for first-degree murder is imprisonment for life, with a minimum ten years fixed. The life sentence, with twenty-five years fixed, is obviously within that boundary.

The remainder of the transcript from the sentencing hearing illustrates that the district court made its decision by an exercise of reason and proper consideration of the objectives of criminal punishment. In describing Bodenbach's actions, the district court stated that the killing was "senseless, needless, based and fueled on emotion, drugs and the culmination of a lifetime spent in that mix, in that lifestyle, that somehow made it seem okay to carry a loaded pistol

17

across that apartment compound with extra bullets in his pocket and killing on his mind." The district court noted that Bodenbach grew up in a loving and stable home environment. Further, the district court noted Bodenbach's issues with drugs and his actions when he was under the influence of them, including instances of violence involving his mother and destruction of property. It discussed opportunities afforded to Bodenbach by the State of California to obtain treatment for his addiction, which Bodenbach failed to take advantage of. The district court found that Bodenbach never showed remorse or guilt for the killing.

The district court thoroughly considered each objective of criminal punishment including the safety of the public, the possibility of rehabilitation, the punishment for the seriousness of the crime, and deterrence. This demonstrates the district court exercised reason in reaching its conclusion and considered the objectives of criminal punishment in its sentencing decision. Therefore, the district court did not abuse its discretion in sentencing Bodenbach to life in prison, with twenty-five years fixed.

Many of the arguments made by Bodenbach on appeal merely ask this Court to reweigh the district court's factual findings or that the district court mistook certain facts as aggravating, rather than mitigating. However, "the determination of whether a factor is mitigating or aggravating in a specific case is a factual one." *State v. Porter*, 130 Idaho 772, 789, 948 P.2d 127, 144 (1997). "Therefore, in reviewing a sentencing court's consideration of a factor as aggravating or mitigating, this Court employs the clearly erroneous standard applicable to factual determinations." *Id.*

Here, the district court determined that Bodenbach's actions, while under the influence of drugs, included aggressive, paranoid, and dangerous behavior. Further, it found that Bodenbach's previous efforts to regain sobriety had failed. Bodenbach does not contend that these findings are clearly erroneous. Rather, he argues that the district court failed to appreciate his addiction as a mitigating factor. Addiction, by itself, can be either or both a mitigating factor and aggravating factor at sentencing. However, as noted above, this is a factual determination for the district court and the district court's determination was not clearly erroneous. Therefore, the arguments put forth by Bodenbach are unavailing. Accordingly, the district court did not abuse its discretion in sentencing Bodenbach.

18

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment of conviction and the sentence imposed. In sum, Bodenbach failed to demonstrate the jury instruction amounted to fundamental error. The district court did not err in denying Bodenbach's motion to suppress. And, the district court did not abuse its discretion in imposing the sentence it did.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.