**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket Nos. 48685 & 48686**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: April 29, 2022** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) **THIS IS AN UNPUBLISHED** |
| MATTHEW STILLHALLIS KELLY, | ) **OPINION AND SHALL NOT** |
| | ) **BE CITED AS AUTHORITY** |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Jonathan Medema, District Judge.

Judgments of conviction and aggregate, unified sentence of fifty-four years, with a minimum period of confinement of thirty-five years, for aggravated battery on a law enforcement officer, grand theft by possession of stolen property, three counts of burglary and two counts of grand theft, affirmed.

Waldron Legal, PLLC; Maya P. Waldron, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent.

LORELLO, Chief Judge

In these consolidated cases, Matthew Stillhallis Kelly appeals from his judgments of conviction and aggregate, unified sentence of fifty-four years (with a minimum period of confinement of thirty-five years) for aggravated battery on a law enforcement officer, grand theft by possession of stolen property, three counts of burglary, and two counts of grand theft. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

An officer attempted to stop Kelly after observing him operating a motorcycle matching the description of one reported stolen. Kelly fled, leading the officer on a high-speed chase until

1

the motorcycle's engine failed. After abandoning the motorcycle to flee on foot through a golf course during a youth golf tournament, Kelly pulled a handgun from his backpack and initiated an exchange of fire with the officer who was pursuing him in a patrol vehicle. Kelly shot the officer twice. Kelly, who was not hit during the exchange of gunfire, escaped the wounded officer and hid in a nearby cornfield. Kelly eventually surrendered to the officers who were searching for him. Subsequent investigation revealed that Kelly (with the aid of his father) had executed a string of thefts and burglaries over the preceding eight months--progressing from victimizing large retailers to burglarizing residential outbuildings and then homes, including occupied homes.

In Docket No. 48685, the State charged Kelly with aggravated battery on a law enforcement officer, grand theft by possession of stolen property, felony eluding a peace officer, and a sentencing enhancement for using a firearm or deadly weapon during the commission of a crime. In Docket No. 48686, the State charged Kelly with possession of a controlled substance, two counts of malicious injury to property, ten counts of grand theft, eighteen counts of burglary, and a sentencing enhancement for use of a firearm during the commission of a crime. The charges in Docket No. 48686 were based on Kelly's months-long string of thefts and burglaries. In total, Kelly was charged with more than thirty felonies, one misdemeanor, and two firearm sentencing enhancements. Pursuant to a global plea agreement, Kelly pled guilty to aggravated battery on a law enforcement officer (I.C. § 18-915(1)) and grand theft by possession of stolen property (I.C. §§ 18-2403(4), -2407(1)) in Docket No. 48685. In Docket No. 48686, Kelly pled guilty to two counts of burglary (I.C. § 18-1401) and three counts of grand theft (I.C. §§ 18-2403(1)-2407(1)(b)). In exchange for Kelly's pleas, the State agreed to dismiss the other charges. During the presentence investigation, Kelly indicated that he committed the crimes both to support his drug use and because he enjoyed the "rush" of stealing. The district court sentenced Kelly to an aggregate, unified term of fifty-four years, with a minimum period of confinement of thirty-five years. Kelly appeals.

## II.

## STANDARD OF REVIEW

Appellate review of a sentence is based on an abuse of discretion standard. *State v. Burdett*, 134 Idaho 271, 276, 1 P.3d 299, 304 (Ct. App. 2000). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the

lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

## III.

## ANALYSIS

Kelly argues that his sentence is excessive and that the district court relied upon clearly erroneous factual findings in imposing sentence while "largely ignoring" certain mitigating factors and improperly applying the goal of punishment. The State responds that the record supports the district court's factual findings and that Kelly failed to establish that his sentence is otherwise excessive. We hold that Kelly has failed to show the district court abused its sentencing discretion.

**A.     Factual Findings**

Kelly contends that the district court relied upon two clearly erroneous factual findings in fashioning his sentence. To be clearly erroneous, factual findings must lack the support of substantial, competent evidence. *State v. Bodenbach*, 165 Idaho 577, 592, 448 P.3d 1005, 1020 (2019). Kelly asserts that the district court incorrectly found that he "had a plan to shoot, and had practiced shooting, law enforcement" and that he "had a value system that did not, and likely never could, value human life." We reject both of these arguments.

During Kelly's sentencing hearing, the district court noted that his statements to law enforcement and his skill with a firearm made it "apparent" he had "thought about using a firearm to evade going to jail or prison." In support of this determination, the district court first observed that Kelly was "good with a firearm," which suggested he "put some training into using one in the past" and "some thought into what would happen if" confronted by police. That Kelly "handled [his] firearm capably in an extremely stressful situation" and was "able to hit the police car" with a handgun after exchanging fire with an officer while fleeing on foot, combined with his admission that he and his father "always had a plan" that Kelly's "father would come rescue" Kelly if he was about to be caught, indicated to the district court that he planned and prepared to use a firearm against police if they tried to apprehend him.

Kelly asserts that his facility with a firearm and statements to the presentence investigator cannot support a finding that Kelly planned and practiced shooting law enforcement. Kelly asserts

3

that his history as a "gun owner and hunter" explains his skill with firearms. Additionally, Kelly notes that the presentence investigator "said nothing about planning to shoot law enforcement" or "about *practicing* shooting law enforcement." Rather, the presentence investigator indicated that "if [Kelly] was ever about to be caught, the plan was for [him] to run," and Kelly's father would aid in the escape. Thus, Kelly contends that the district court's "factual findings" regarding whether he planned and practiced to shoot law enforcement to avoid apprehension are conjecture. We are not persuaded.

Initially, we note that Kelly overstates the district court's comments regarding Kelly's preparation to use a firearm against officers. Kelly characterizes the district court's comments as constituting a finding that he "had practiced shooting law enforcement," which could be read as suggesting that Kelly in fact did, or somehow simulated, shooting at officers in the past. As described above, the district court indicated that Kelly had "put some training" into using a firearm and thought about what would happen if confronted by police. These comments cannot be fairly construed as suggesting Kelly had "practiced shooting law enforcement" as he suggests. Rather, reasonably construed, the district court's comments express a belief that Kelly had trained with a firearm and mentally prepared to use it against officers if necessary.

Moreover, Kelly's arguments regarding his alleged prior experience as a "hunter and gun owner" do not explain the firearm skill he demonstrated while fleeing police. During the proceedings below, Kelly claimed familiarity with shotguns and long rifles--not handguns like the one he used to shoot an officer. It is unclear how this experience trained Kelly to use the "'legitimate' shooter's stance" that indicated "a degree of training," or to employ his backpack as a stabilizer to improve his firing position as described by the officer Kelly shot. Nor does Kelly explain how his purported experience hunting *wildlife* would prepare him to shoot *an officer* or hit a patrol vehicle at a distance exceeding two hundred feet while fleeing police when, as he claims, he had not slept for four days, was under the influence of methamphetamine, and feared being killed.

Kelly's interpretation of the statements he made to the presentence investigator fail to account for other evidence in the record indicating a preexisting intention to use deadly force to avoid apprehension if necessary. Although the presentence investigator did not indicate that Kelly expressed an overt, calculated intention to shoot officers, Kelly did reveal that he planned to "run"

4

if he was "about to be caught" and that his father would aid Kelly's escape. Moreover, Kelly failed to explain, either before the district court or on appeal, why he had two *loaded* handguns on his person when he stole the motorcycle if he had not already resolved to use them to avoid apprehension if necessary. Considering Kelly's decision to carry loaded firearms, his apparent skill when using the weapons against an officer in high-stress circumstances and his stated intention to run from law enforcement, a reasonable factfinder could determine that Kelly planned and prepared to use whatever force necessary (including shooting and potentially killing officers) to avoid apprehension.

Kelly's argument that the district court clearly erred by finding that he "had a value system that did not, and likely never could, value human life" is similarly unavailing. When assessing whether Kelly's willingness to kill an officer to avoid apprehension was "the product of some limited circumstance" or just "who [Kelly is]," the district court determined that neither his mental health issues[1] nor his substance abuse explained his decision to shoot an officer. In support of this determination, the district court observed that, despite developing his mental health issues in early childhood, Kelly had been a "law-abiding person" for much of his life. The district court further noted that it interacted with "a significant number of people . . . who use illegal drugs" and "lots of them don't want to go to jail when the lights come on in the police car behind them." The district court further commented that "the vast majority of [people] don't . . . put everyone else at risk by running from the police . . . onto [a] golf course in the middle of a junior golf tournament . . . and they don't . . . try to shoot the police officer who is trying to take them to jail." Thus, the district court determined that neither Kelly's mental health nor drug use explained his decisions.

Instead, the district court considered Kelly's "value system," which "sets limits on what we are willing to do," as providing greater insight into Kelly's decision making. On this subject, the district court observed:

> [I]n my judgment, we all have a value system that I think is formed very early in our growth as humans, sometime in the early part of childhood, and that value system sets limits on things that we're willing to do. . . . [T]here is, I think for

---

[1] A forensic psychologist retained to provide a report to the district court regarding Kelly's mental condition indicated he suffers from Post-Traumatic Stress Disorder, Attention Deficit Disorder, and "some cognitive impairments."

everyone, simply a core of acts that there are no circumstances under which [they would] be willing to commit them, and what [Kelly has] done here, tells me that [he's of] a different character than the vast majority of people.

[Kelly was] willing to kill another human being because [Kelly] didn't want to go to prison.

Despite acknowledging Kelly's youth and that young people can change, the district court indicated that such change was "harder than most people expect" and that it was unsure "what the Department of Correction would need" to help Kelly "develop values about the dignity and life" of human beings other than his friends and family. Consequently, the district court lacked confidence in Kelly's rehabilitative potential and needed to "protect the community from the risk that [he] might do something similar to this again."

Kelly contends that the district court "filtered the evidence in this case through its own personal world view" to reach the erroneous inference that he "did not, and likely never could, value human life." We disagree. The record indicates that Kelly executed a string of thefts, burglaries and home invasions spanning approximately eight-months, at least in part, because he enjoyed the "rush" and "thrill" it provided. When it appeared Kelly was about to be apprehended, he fled on a motorcycle and then on foot through a golf course during a youth golf tournament where he initiated an exchange of gunfire with police. As discussed above, the district court reasonably determined that Kelly's decision to shoot an officer was neither spontaneous, thoughtless, nor an aberration. Thus, the district court reasonably determined that Kelly has "a value system that makes [him] dangerous to . . . society."

Moreover, Kelly overstates the district court's comments by asserting that it found "he was so depraved that [the Department of Correction] can do nothing for him." More than once during the sentencing hearing, the district court expressed "hope" that Kelly could "change" but was *unsure* what the Department could do to inculcate in him a respect for the lives of those other than his family or friends. Nor does the record indicate, as Kelly contends, that the district court determined he "had a nearly-immutable value system . . . [he] could do little to change." To the contrary, the district court expressly noted that Kelly's sentence could not result in him remaining in custody for the rest of his expected life span even if the Department "determines that [he has not] changed and [he is] not an appropriate risk to be released into the community." In sum,

although Kelly disagrees with the district court's evaluation of his rehabilitative potential, the record does not show that the district court found him to be beyond rehabilitation.

**B.    Sentence Review**

Kelly also argues that the district court "failed to give proper weight to the mitigating factors in this case," including his limited criminal history, "young age, mental health concerns, adolescent brain, and drug use," and by improperly considering the goals of sentencing. According to Kelly, these errors caused the district court to overlook his rehabilitative potential and overestimate the sanction that would appropriately serve other goals of punishment. These arguments are unpersuasive.

Where a sentence is not illegal, the appellant has the burden to show that it is unreasonable and, thus, a clear abuse of discretion. *State v. Brown*, 121 Idaho 385, 393, 825 P.2d 482, 490 (1992). A sentence may represent such an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *State v. Nice*, 103 Idaho 89, 90, 645 P.2d 323, 324 (1982). A sentence of confinement is reasonable if it appears at the time of sentencing that confinement is necessary to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation, or retribution applicable to a given case. *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). Where an appellant contends that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record, having regard for the nature of the offense, the character of the offender, and the protection of the public interest. *State v. Reinke*, 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct. App. 1982). When reviewing the length of a sentence, we consider the defendant's entire sentence. *State v. Oliver*, 144 Idaho 722, 726, 170 P.3d 387, 391 (2007).

The record belies Kelly's contention that the district court "largely ignored mitigating factors." At sentencing, the district court referenced Kelly's youth, mental health issues, and substance abuse. As previously stated, the district court discussed both Kelly's mental health and substance abuse issues in relation to his decision to commit crimes, concluding that neither issue explained his criminal conduct. At more than one point during the sentencing hearing, the district court also referenced Kelly's youth and that "young people can change." Although the district court did not expressly consider how Kelly's neurophysiological development affected his behavior, it discussed at length the mental health evaluation Kelly submitted that contained the

references to his "adolescent brain" and purportedly low risk of recidivism. Specifically, the district court noted that the evaluation read "more like a legal argument than . . . a forensic evaluation by a psychiatrist or psychologist," which suggested the evaluator at the least had "an agenda as far as criminal justice reform as a broad matter" was concerned. For example, the assessment quotes United States Supreme Court case law examining the connection between brain function and criminal culpability, which the district court interpreted as advocacy of a particular legal position. The district court further noted that it reviewed "with some care" the section of the evaluation assessing Kelly's recidivism risk, observing that the evaluator did not describe "much about the instruments he's used" to develop his opinions or how "he scored those instruments." In light of these concerns, the district court afforded little weight to the evaluator's risk assessments.

Whether a particular factor is aggravating, mitigating, or both for purposes of sentencing is a factual question. *See Bodenbach*, 165 Idaho at 592, 448 P.3d at 1020. For instance, an offender's drug use can be an aggravator, mitigator, or both depending upon the circumstances. *Id.* The relative *weight* a factor should receive is a matter for the factfinder that is not susceptible to proof by either party. *State v. Sivak*, 105 Idaho 900, 905, 674 P.2d 396, 401 (1983). To the extent Kelly argues that factual errors by the district court tainted its consideration of aggravating and mitigating circumstances, his argument fails because he has not shown that the district court made an erroneous factual finding.

Kelly's arguments that the district court failed to properly consider the sentencing goals of deterrence and retribution are also unpersuasive. When imposing Kelly's sentences, the district court discussed each of the goals of sentencing under Idaho law. In discussing the goals of punishment and deterrence, the district court observed that it was "difficult to imagine a circumstance where someone would commit an aggravated battery on a law enforcement officer that would be worse than what [Kelly] did." On appeal, Kelly again overstates the district court's view, arguing that it characterized "the aggravated battery as the worst it could be" without becoming a murder case. Kelly attacks this strawman by contrasting his act of twice shooting the officer with a planned ambush of an officer or a shooting that "left the officer in a coma or paralyzed." That Kelly can invent hypothetical circumstances that he believes to be incrementally worse than his criminal conduct does not show that the district court abused its discretion when

8

imposing sentence for what it reasonably found to be a calculated decision to shoot at officers to avoid apprehension.

Regarding the goal of deterrence, Kelly asserts that comparisons the district court drew between this case and "recent social movements protesting police brutality" show that "apparent disapproval" of those movements "infected [the district court's] sentencing decision." A reasonable and fair reading of the record cannot sustain this argument. Although the district court referenced the "significant amount of national press attention to incidents involving violence between police and citizens" in the recent past, it then contrasted the simple noncompliance of those being arrested in such incidents with Kelly's willingness "to hurt others to avoid going to jail," which "makes [an officer's] job incredibly difficult and an incredibly dangerous one." As a result, the district court expressed a desire to "deter other people from doing similar things" by imposing a sentence on Kelly that would show others that "there are going to be significant consequences" for shooting an officer. Considered in this context, the district court's reference to violent interactions between police and citizens cannot, as Kelly claims, be reasonably interpreted as an indication that his sentence was intended to deter "constitutionally-protected activity of which the [district court] personally disapproved" in addition to violent, unlawful resistance to officers.

Although our standard of review of an excessive sentence claim requires an independent review of the record, having regard for the nature of the offense, the character of the offender and the protection of the public interest, we do not reweigh the evidence. *State v. Windom*, 150 Idaho 873, 879, 253 P.3d 310, 316 (2011). Rather, our role is to determine whether reasonable minds could reach the same conclusion as did the district court. *Id.*; *State v. Biggs*, 168 Idaho 112, 116, 480 P.3d 150, 154 (Ct. App. 2020). We reach that conclusion in this case. The district court identified the correct legal standards, recognized its discretionary authority to fashion Kelly's sentences, acted within the bounds of that discretion, and exercised reason when imposing sentence. Kelly has failed to show the district court abused its discretion or imposed excessive sentence.

## IV.
## CONCLUSION

Kelly has failed to show that the district court based his aggregate, unified sentence upon clearly erroneous factual findings or otherwise abused its sentencing discretion. Accordingly, Kelly's judgments of conviction and sentence are affirmed.

Judge GRATTON and Judge HUSKEY, **CONCUR**.