# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48723

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Boise, August 2021 Term |
| | ) | |
| v. | ) | Opinion filed: March 2, 2022 |
| | ) | |
| ALEJANDRA MARIA OCHOA, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Respondent. | ) | |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Canyon County. D. Duff McKee, Senior District Judge. Jerold W. Lee, Magistrate Judge.

The decision of the district court is reversed and remanded.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Appellant. Kenneth Jorgensen argued.

Canyon County Public Defender, Caldwell, for Respondent. Jill Musser argued.

_____

MOELLER, Justice.

Alejandra Maria Ochoa was convicted of misdemeanor vehicular manslaughter by a Canyon County jury. She appealed her conviction to the district court, which vacated the judgment of conviction and remanded the case for a new trial. The district court held that the magistrate court erred in excluding certain toxicological evidence, refusing to grant defendant's request to continue the trial, and allowing the State's pathologist to testify. The State now appeals from the district court's decision. For the reasons set forth below, we reverse the decision of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Accident

On April 26, 2018, Alejandra Maria Ochoa ("Ochoa") drove her vehicle from a Jacksons convenience store parking lot onto Midway Road in Nampa. Surveillance footage from the convenience store showed that Ochoa failed to stop at the curb before entering the street. As she

1

crossed over the northbound lane, Ochoa began turning left onto the southbound lane. In so doing, Ochoa cut across the path of a motorcycle traveling in the northbound lane, which skidded and went down on its left side as it attempted to avoid Ochoa's vehicle before she completed her turn. The motorcycle struck Ochoa's vehicle. The operator of the motorcycle, the victim, was conscious and alert at the scene immediately following the accident. However, after paramedics transported the victim to St. Alphonsus Regional Medical Center in Boise, he continued losing blood and later died.

## B. Pretrial Proceedings

The State charged Ochoa with misdemeanor vehicular manslaughter. Ochoa pleaded not guilty, and her trial was initially set for March 20, 2019. The State filed a motion to continue the trial, and the magistrate court reset the trial for April 3, 2019.

A toxicology report showed the victim had methamphetamine, amphetamines, and methadone in his system. The victim also had a small bag of heroin on his person. Before trial, the State moved to exclude the toxicology evidence related to the illegal substances found in the victim's blood and the heroin found on his person. The State argued that the toxicology report was not relevant to Ochoa's vehicular manslaughter charge because there was no evidence that the substances in the victim's blood contributed to the collision. Alternatively, the State asserted that even if the evidence were admissible, it should not be admitted because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The State also contended that the heroin found on the victim's person after the accident would be highly prejudicial with little to no probative value. The magistrate court granted the motion regarding the bag of heroin and reserved ruling on the toxicology report until an evidentiary hearing took place.

On March 26, 2019, eight days before trial, Ochoa moved to exclude the testimony of Dr. Glen Groben, the forensic pathologist who determined the victim's cause of death, because she claimed Dr. Groben had not been disclosed as an expert witness prior to the discovery deadline. Dr. Groben's medical evaluation was largely based on his analysis of the medical records created by the treating physicians at the hospital where the victim had died, and Ochoa objected to the State's failure to disclose the records on which Dr. Groben relied. At a status conference held on March 28, 2019, the State argued that it had clarified prior to the deadline that Dr. Groben would be an expert witness, and that his coroner's report, which included the basis of its conclusions, had been disclosed months before. However, the parties disputed whether Ochoa's discovery request

required the State to provide the medical records themselves under Idaho Rules of Evidence 702, 703, or 705. The magistrate court concluded the State did not need to provide all the data Dr. Groben had reviewed, but only the facts and data he had relied on—which were then contained in Dr. Groben's report. The magistrate court denied Ochoa's request to exclude Dr. Groben as a witness. Ochoa requested the trial be continued to give her additional time to prepare. This request was granted. Ochoa had not yet waived her speedy trial rights.

On March 28, 2019, Ochoa made a specific request for all medical records Dr. Groben had reviewed or relied upon, including the toxicology report. The magistrate court issued a subpoena duces tecum for all medical records from St. Alphonsus Regional Medical Center pertaining to the victim.

The State moved again to continue the trial date because of witness unavailability. The motion was granted, and the trial was re-set for May 8, 2019. Ochoa received the medical records on April 10, 2019. Ochoa moved for another continuance based on the late receipt of the records, but the magistrate denied the request, concluding that Ochoa had known that the victim's cause of death would be an element of the vehicular manslaughter charge and that she could have foreseen that the medical records would be relevant.

On April 23, 2019, an evidentiary hearing was held on the State's motion to exclude the toxicology report. Ochoa called David Cavanaugh, a former police officer, "Drug Recognition Expert master instructor," "Collision Reconstruction Expert," and owner of Northwest Forensic Crash Reconstruction. Cavanaugh testified that the presence of methamphetamine "in the system" could impair the ability of someone to operate the vehicle safely. Some ways to test impairment would be through field sobriety tests or observation of how the operator is driving the vehicle. In this case, Cavanaugh would have considered the victim's speed, the victim steering his motorcycle into Ochoa instead of away, the use of only the rear brake to stop the motorcycle, and the bandages around his fingers—as evidence of possible methamphetamine use—to determine that the victim may have been impaired. He stated that to evaluate a driver for impairment levels it is important to observe physical indicators. This is because "there is no per se limit for drugs in Idaho;" in other words, unlike alcohol, there is not an established "legal limit" for drugs like methamphetamine. Cavanaugh conceded that if he received a toxicology report in a case in which he did not evaluate a person for impairment through the physical and physiological indicators, he would be unable to

say that person was impaired solely based on the toxicology report. The substance of his testimony was as follows:

> **Q [PROSECUTOR]:** And why is it important for you to do those evaluations when determining impairment level?
>
> **A [CAVANAUGH]:** Because, there is no per se limit for drugs in Idaho. So -- and I'm not aware of any State that has a per se limit for the parts per million or whatever number they use. So what we're looking for is their ability to perform the divided attention tests and the physiological indicators such as pulse, blood pressure, pupil reaction to light and so on. So those are how we establish the criminal case.
>
> **Q:** So if you were to receive a toxicology result, say, in any case where you hadn't evaluated the person for impairment, would you be able to say, just based on the toxicology result, that that person was impaired?
>
> **A:** No.
>
> **Q:** Why is that?
>
> **A:** There would have to be other -- other evidence. I would need to have something about -- again, it would begin -- it would start to add up the more information I had. So driving pattern, what was the probable cause for the stop, or the contact, and however the contact came about. What are some of the evidentiary things that were collected? Those would all be things that could go toward making that final conclusion.
>
> . . .
>
> **Q:** Okay. And you wouldn't be able to say with a reasonable degree of certainty that they were impaired and, therefore, that was the cause of the particular crash?
>
> **A:** That's correct.

The State next called Dr. Groben, who testified that the results of the toxicology report did not impact the manner and cause of the victim's death. Even considering the substances in his system, the victim was going to die due to the extensive nature of his injuries. By the time the victim arrived at the hospital, he was already experiencing refractory hypotension—extremely low blood pressure due to severe loss of blood—and the attending physicians could not stop the bleeding.

Ultimately, the magistrate court excluded testimony regarding the substances in the victim's system. The magistrate court noted that no witness could say with a reasonable degree of certainty as to the victim's level of impairment or whether the victim's actions were affected by the substances to such a degree as to contribute to the accident. Therefore, the magistrate court found the probative value of the proffered evidence was substantially outweighed by its prejudicial effect. The magistrate court summarized its ruling as follows:

In fact, I heard Mr. Cavanaugh say he could not put any reasonable degree of certainty without more information, make that type of opinion. So one – or even if there is some relevance to it, I'm going to find that the probative value is substantially outweighed by its prejudicial value and, therefore, I am going to exclude, one, testimony or information regarding the methamphetamine, the amphetamines, or any methadone in the system of the deceased as being introduced into evidence.

After the magistrate court's ruling, Ochoa moved to continue the trial, reasoning that she had not had enough time to go through the recently received medical reports. The magistrate court denied the motion.

On April 25, 2019, Ochoa moved again to continue the trial, arguing that by not yet disclosing the full toxicology report, the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963). On the afternoon before trial, Ochoa received the full toxicology report on the victim. It consisted of over 400 pages and contained information indicating the victim may have also had alcohol and marijuana in his system. On the day of the jury trial, before jury selection commenced, Ochoa renewed her motion for a continuance, arguing that she had just received the toxicology report and there were things in there that she should be able to explore before trial. Ochoa asserted that if she had more time to consult with an expert about the toxicology report and its conclusions, she could determine how close in time the victim used methamphetamine before operating the motorcycle. Under *Brady*, Ochoa asserted that she should have an opportunity to review the disclosures to determine whether there was exculpatory information contained in the full report. The magistrate court denied Ochoa's motion to continue, citing her late request of the documents and it being outside the power and control of the State since the report was generated by a third-party agency, so it did not fall under *Brady's* progeny.

## C. The Trial and Aftermath

Ochoa's four-day trial commenced on May 8, 2019. During the State's case-in-chief, Dr. Groben, a now-retired forensic pathologist with the Ada County Coroner's Office,[1] testified that he had determined the cause of the victim's death by examining the exterior of the victim's body. Dr. Groben relied on the medical records, made by the physicians who had treated the victim and performed the emergency surgery, for information about the victim's interior wounds. Ochoa objected to Dr. Groben's testimony from the medical records on the basis that it was hearsay and

---

[1] When Dr. Groben testified at the motion hearing on April 23, 2019, he was still working for the Ada County Coroner's office; however, he had retired by the time he testified at trial.

that it violated Ochoa's constitutional right to confrontation. The State asserted that Dr. Groben could testify to the facts and data contained in the medical records of the treating physicians that formed the basis of his opinion regarding the victim's cause of death, which he attributed solely to blunt force trauma due to the motorcycle accident. On cross-examination, Dr. Groben noted the essential role the medical records had for him to determine the cause of death in this case—a case in which a person is treated by medical personnel just prior to death. Because the original state of the injuries had been altered by treatment, only the medical records—not a full body autopsy— would allow him to understand the injuries the physicians saw, i.e., the injuries as they were after the accident and prior to treatment. He needed the medical records to understand the injuries the physicians saw in the hospital. Dr. Groben explained the protocols for determining cause of death in a situation such as this one:

> **Q [PROSECUTOR]:** Is it normal for people in your field to look at medical records instead of opening up a body yourself?
> **A [DR. GROBEN]:** Well, they look at medical records – they better look at medical records whenever there are medical records.
> . . .
> **Q:** So Dr. Groben, you're saying that, even if you did an autopsy, you wouldn't be able to tell what the injuries were initially because they've been altered?
> **A:** Well, I would have – I would have seen what they did and been able to get an idea. But it was obvious that he had injuries to his pelvic region. So I would have been able to see what they had done. But to know exactly what was there before they started, of course I would have to review the medical records. It would be malpractice if I didn't.
> . . .
> **Q:** . . . How often do you rely on medical records when doing body inspections?
> **A:** Well, if there's a medical record, I'll review it on every case I do. And I include it in my findings on every case I ever do where we went through the medical records. I've been doing it for 20 years. And in case like this where they've done surgery. It's absurd for me to go in and look because they've already repaired everything. So I wouldn't even be able to tell for sure the injuries for sure because they repaired it. So for me to know exactly what was there that caused their injury, it's mandatory. Even if I'd done an autopsy, I would've reviewed the medical records and included that in my report because they're the ones who found it and then changed it. So it was all changed by the time I got there. Medical records are absolutely important to determine -- for me to determine what caused this person's death.

The magistrate court overruled Ochoa's objection and allowed Dr. Groben's testimony, including allowing him to testify regarding the medical facts and data contained in the medical reports. The magistrate court reasoned that the testimony fell under the hearsay exception contained in Idaho

Rule of Evidence 703, and that the facts and data as to the injuries sustained by the victim would help the jury understand the cause of death.

Dr. Groben then testified to the extensive injuries the victim suffered from the accident, including a collapsed lung, rib fractures, multiple fractures in his pelvis, and tearing of the arteries in his pelvis. The tearing of the pelvic arteries led to refractory hypotension. Refractory hypotension occurs when a person has lost around sixty percent of their blood supply. Dr. Groben explained: "So no matter how much blood you give them, no matter how many pressors, which are chemicals that you give them to increase their blood pressure, it won't – it doesn't do any good. And that's what happened in this case." Based on the injuries noted by the operating physicians, Dr. Groben concluded the victim had died from blunt force trauma and the massive blood loss caused by the accident.

Nathan Madenford, a State Trooper with the Idaho State Police and a crash reconstructionist, was called to investigate this incident and testified in the State's case. Trooper Madenford's investigation concluded that the collision was caused by Ochoa entering the intersection and causing an immediate hazard in front of the victim's line of travel. During his investigation, Trooper Madenford determined that the victim likely only applied the rear motorcycle brake, instead of both the front and rear brakes, and the victim applied the brake for about 68 feet before the victim laid the motorcycle down on its left side and slid into Ochoa's vehicle. At the point of collision, Ochoa's vehicle was in the southbound lane; however, when the victim's motorcycle was on its side, it slid across the northbound lane into the southbound lane. Trooper Madenford also determined that the victim's speed was about 50–55 miles per hour before he applied his brakes. The speed limit for the northbound lane of that road was 45 miles per hour. However, by Trooper Madenford's calculations, the victim would not have been able to stop even if he was adhering to the speed limit.

Ochoa called David Cavanaugh to testify in her case-in-chief. His ultimate opinion was that had the motorcycle been going the speed limit and used both motorcycle brakes effectively, the victim would have been twenty-six feet away from Ochoa when she exited his lane into the southbound lane. Cavanaugh estimated the victim's speed to be almost 58 miles per hour at the time of the accident. He concluded that the victim's speed and inefficient reaction caused the collision.

7

At the conclusion of the trial, the jury returned a guilty verdict on the charge of vehicular manslaughter. The magistrate court sentenced Ochoa to 365 days in jail with 325 days suspended—leaving her to serve 40 days in jail—and unsupervised probation for 24 months. In lieu of 30 days jail, she was given 200 hours of community service. In lieu of the remaining 10 days in jail she was ordered to complete the "Alive at 25" driver awareness course.[2] Additionally, her driving privileges were suspended for 180 days. Ochoa appealed her conviction to the district court.

## D. Appeal to the District Court

On intermediate appeal, the district court addressed three issues: (1) whether the magistrate court erred by granting the State's motion in limine and excluding the toxicology report; (2) whether the magistrate court erred by denying Ochoa's motions to continue the trial; and, (3) whether the magistrate court erred by permitting Dr. Groben to testify about the medical records he relied on in reaching his conclusions. The district court held the magistrate court erred on all three issues, vacated Ochoa's judgment of conviction, and remanded the case for a new trial.

Regarding the exclusion of the toxicology report, the district court concluded that the victim's drug use was relevant and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The district court rooted its decision in the principle of comparative negligence: rationalizing that the State had the burden to show Ochoa *negligently* violated the law and that introduction of negligence brings with it the issue of comparative negligence, which considers the victim's fault. Although the district court acknowledged that no witness for Ochoa could testify as to whether, and to what degree, the victim might have been impaired by the substances in his blood, it reasoned that the jury should have been allowed to consider all factors that might have led to the victim's death, including the victim's possible impairment.

Next, the district court determined that the magistrate court abused its discretion by denying Ochoa's motion to continue the trial when Ochoa received the full toxicology records the day before trial. The district court concluded that Ochoa was prevented from reviewing the

---

[2] Alive at 25 is a "4 ½ hour driver's awareness course designed by the *National Safety Council* for young drivers ages 15–24 which includes: [d]efensive driving classroom curriculum [to help] gain awareness and develop strategies to keep safe on the road. Decision-making and responsibility-taking [is taught] [] through interactive media, workbook exercises, role-playing, and class discussions." Alive at 25, https://aliveat25.us (last visited March 1, 2022). Ochoa was 23 years old at the time of the incident.

extensive toxicology report—an essential component of trial preparation—especially considering the involvement of drugs in the victim's system.

Finally, the district court held that the magistrate court erred by allowing Dr. Groben to recite the medical facts and data from the victim's medical records. The district court rationalized that Dr. Groben had not formed his own opinion regarding the victim's cause of death, but merely relied on the findings in the medical reports. The district court held that Dr. Groben's testimony was hearsay without a valid exception.

The State appealed the district court's decision to the Court of Appeals. The Court of Appeals reversed the district court on all three issues. *See State v. Maria Ochoa*, No. 47796, 2020 WL 6555168 (Idaho Ct. App. Nov. 9, 2020), *review granted* (Apr. 6, 2021). Ochoa petitioned for review, which this Court granted.

## II. STANDARD OF REVIEW

We have previously stated the proper standard of review for cases which come before us on a petition for review from a decision of the Court of Appeals as follows: "this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the lower court." *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007) (citing *Head v. State*, 137 Idaho 1, 43 P.3d 760 (2002)).

When considering an "appeal of a decision rendered by a district court while acting in its intermediate appellate capacity, this Court directly reviews the district court's decision." *State v. Chernobieff*, 161 Idaho 537, 539, 387 P.3d 790, 792 (2016) (quoting *In re Doe*, 147 Idaho 243, 248, 207 P.3d 974, 979 (2009)). However, to determine whether there was an abuse of discretion, we independently review the record of the proceeding before the magistrate court. *Id. Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 157 Idaho 395, 397, 336 P.3d 802, 804 (2014) (quoting *In re Doe*, 147 Idaho at 248, 207 P.3d at 979). In independently reviewing the record,

> [t]he Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

9

*Papin v. Papin*, 166 Idaho 9, 18, 454 P.3d 1092, 1101 (2019) (quoting *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012)). Therefore, in reviewing a case on intermediate appeal, we do not directly review the decision of the magistrate court. Rather, "we are procedurally bound to affirm or reverse the decisions of the district court." *State v. Korn*, 148 Idaho 413, 415, 224 P.3d 480, 482 (2009).

Whether evidence is relevant is a question of law and is subject to de novo review. *State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993). The trial court's broad discretion as to the admission and exclusion of evidence will only be reversed when there is a clear abuse of discretion. *State v. Folk*, 162 Idaho 620, 625, 402 P.3d 1073, 1078 (2017). Trial courts also enjoy broad discretion in deciding whether to admit expert testimony and whether to grant or deny a motion for continuance. *Egbert v. Idaho State Ins. Fund*, 125 Idaho 678, 680, 873 P.2d 1332, 1334 (1994) ("Our trial courts have broad discretion in deciding whether to admit expert testimony"); *State v. Daly*, 161 Idaho 925, 927, 393 P.3d 585, 587 (2017) ("In Idaho, '[t]he motion for continuance is addressed to the sound discretion of the trial court, and the action of the court will be upheld unless there has been a clear abuse of discretion.' "). When this Court reviews a trial court's discretionary decision, it applies a four-prong test to determine whether there was an abuse of discretion: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choice available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 867, 421 P.3d 187, 198 (2018).

## III. ANALYSIS

### A. The district court erred in reversing the magistrate court's decision to not admit the results of the toxicology report.

The State contends that the district court erred when it applied a comparative negligence standard to the toxicology report because comparative negligence is not a part of a vehicular manslaughter analysis. The State further maintains that the magistrate court's decision to exclude the toxicology report was incorrect because it did not provide sufficient information from which a witness could testify as to the impairment of the victim. Thus, the report at best had only minimal probative value, and that value was substantially outweighed by unfair prejudice. I.R.E. 403.

As noted, a trial court enjoys broad discretion when deciding to admit or exclude evidence. *Folk*, 162 Idaho at 625, 402 P.3d at 1078 . In order to be admissible, evidence must first be relevant.

10

I.R.E. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence[,] and (b) the fact is of consequence in determining the action." I.R.E. 401. "Relevant evidence is admissible unless these rules, or other rules applicable in the courts of this state, provide otherwise." I.R.E. 402. "Whether a fact is 'of consequence' or material is determined by its relationship to the legal theories presented by the parties." *State v. Garcia*, 166 Idaho 661, 670, 462 P.3d 1125, 1134 (2020) (quoting *State v. Shackelford*, 150 Idaho 355, 364, 247 P.3d 582, 591 (2010)). However, even if evidence is deemed relevant, it may still be excluded by the trial court if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." I.R.E. 403. " 'In other words, evidence should be excluded if it invites inordinate appeal to lines of reasoning outside of the evidence or emotions which are irrelevant to the decision making process.' " *Garcia*, 166 Idaho at 670, 462 P.3d at 1134 (quoting *State v. Rhoades*, 119 Idaho 594, 604, 809 P.2d 455, 465 (1991)).

The State charged Ochoa with misdemeanor vehicular manslaughter under Idaho Code section 18-4006, which provides in relevant part: "[m]anslaughter is the unlawful killing of a human being … without malice." This includes vehicular manslaughter, which occurs when, "the operation of a motor vehicle is *a significant cause* contributing to the death because of . . . [t]he commission of an unlawful act, not amounting to a felony, without gross negligence." I.C. 18-4006(3)(c) (emphasis added). The statute does not specify a mental state, but the Court of Appeals has interpreted the statute as requiring at least ordinary negligence. *State v. McNair*, 141 Idaho 263, 267, 108 P.3d 410, 414 (Ct. App. 2005). Accordingly, the State carries the burden to prove that Ochoa's unlawful and negligent driving was a significant cause of the victim's death. I.C. § 18-4006(3)(c).

Prior to trial, the magistrate court granted the State's motion to exclude the victim's toxicology results or any reference to them. The toxicology report showed the victim had methamphetamine, amphetamines, and methadone in his system. However, following a pretrial evidentiary hearing, the magistrate court concluded that no one had been able to testify that the levels of these substances present in his blood indicated that the victim was impaired. Without sufficient evidence of impairment, the magistrate court determined that the toxicology results were irrelevant and unfairly prejudicial. However, on intermediate appeal, the district court held the magistrate court had erred because the toxicology results were relevant to show the victim's

11

possible "comparative negligence." The district court reasoned that because the State had to show Ochoa negligently violated the law, "introducing negligence brings with it the issue of comparative negligence."

In a civil negligence claim, the tortfeasor's action must be the proximate cause of the injured party's harm. *See Haight v. Idaho Dep't of Transportation,* 163 Idaho 383, 414 P.3d 205 (2018). We have previously explained the legal standard for proximate cause as follows:

> "[P]roximate cause focuses on whether legal policy supports responsibility being 'extended to the consequences of conduct.' " [*Cramer v. Slater*, 146 Idaho 868, 875, 204 P.3d 508, 515 (2009).] ..."[T]rue proximate cause deals with 'whether it was reasonably foreseeable that such harm would flow from the negligent conduct.' " *State v. Corbus*, 150 Idaho 599, 602, 249 P.3d 398, 401 (2011) (quoting *State v. Lampien,* 148 Idaho 367, 374, 223 P.3d 750, 757 (2009)).

*Thompson v. State*, 164 Idaho 821, 826, 436 P.3d 642, 647 (2018). A cause that would otherwise be a proximate cause may not be a proximate cause if there is an intervening superseding cause as well. "An intervening, superseding cause generally refers to an independent act or force that breaks the causal chain between the defendant's culpable act and the victim's injury. The intervening cause becomes the proximate cause of the victim's injury and removes the defendant's act as the proximate cause." *Id.* at 828, 436 P.3d at 649 (quoting *Lampien*, 148 Idaho at 374–75, 223 P.3d at 757–58). "In order to be considered an intervening, superseding cause, the victim's conduct must have been an unforeseeable and extraordinary occurrence." *Corbus*, 150 Idaho at 606, 249 P.3d at 405 (citing *Lampien*, 148 Idaho at 374, 223 P.3d at 757). When comparative negligence is considered in tort negligence actions, "[a]s long as the plaintiff is less than fifty percent responsible for her injuries the plaintiff may recover." *Noel v. City of Rigby*, 166 Idaho 575, 589, 462 P.3d 103, 117 (2020).

The statutory language for the crime of vehicular manslaughter at one time resembled the civil standard; it required a determination of "proximate cause." However, in 1983, the legislature removed the proximate cause requirement and later replaced it with "significant cause." H.B. 1, Ex. S.L. 1983, ch. 3, § 17; H.B.143, S.L. 1997, ch. 103, § 1; I.C. § 18-4006(3). The replacement of "proximate" with "significant" in the statute demonstrates that the standard for a "significant cause" is not the same as for "proximate cause." A conviction for vehicular manslaughter, as defined in Idaho Code section 18-4006(3)(c), now only requires the State to prove that the defendant's "operation of a motor vehicle is *a significant cause* contributing to the death," not that the defendant's operation of a motor vehicle is the *only* significant cause or the *most* significant

12

cause. *Id.* (emphasis added). The district court reasoned that discussion of negligence invites the issue of comparative negligence. Determination of proximate cause requires examination of other causes which may be superseding intervening causes. Similarly, comparison of multiple causes may put into perspective whether a cause was "significant." However, the comparison of merely speculative causes will not establish that those causes are significant.

The magistrate court's decision to exclude the toxicology results is in line with our prior decision in *State v. Robinett*, 144 Idaho 110, 113, 106 P.3d 436, 439 (2005) (holding that a report showing blood alcohol content, by itself, was irrelevant to driving under the influence charge under an impairment theory because there was no accompanying evidence to show actual impairment). The mere *presence* of a controlled substance in the blood does not necessarily equate to *impairment* unless expert testimony can establish a causal link on a more probable than not basis. Absent such testimony, evidence of the presence of a controlled substance invites the jury to impermissibly speculate and runs the real risk that prejudice will overcome the lack of actual proof. Here, the magistrate court's decision did not foreclose Ochoa from presenting any evidence regarding the victim's role in the accident. For example, Ochoa was allowed to present evidence concerning the victim's operation of the motorcycle, in particular that the victim was speeding and did not brake effectively. Importantly, the burden remained squarely on the State to show that Ochoa's negligence was a significant cause of the collision.

During oral argument before this Court, Ochoa suggested that determining whether one cause was significant requires an examination of all other potential causes as well. For example, one cause may seem like a significant cause if it is presented in a vacuum as the only cause; however, examination of other existing causes may reveal that cause to be insignificant in comparison. While we agree, generally, that a victim's own negligence is relevant to a charge of misdemeanor vehicular manslaughter, there must be competent evidence of such negligence. Unlike the evidence regarding the victim's driving pattern offered by Ochoa's witness, the toxicology evidence at issue only established the presence of potentially impairing substances without corroborating evidence or testimony showing the victim was *actually impaired*. The report does not make it more or less probable that the victim was impaired than it makes it more or less probable that he was not impaired. Thus, the report does not make "a fact of consequence" more or less likely. I.R.E. 401. Because there was no evidence that the victim was actually impaired, there is nothing revealed in the toxicology report to compare to Ochoa's criminal negligence in

13

failing to stop before entering the road. Such a comparison of causes, when one is purely speculative, is not appropriate, especially given the high likelihood that such evidence would result in unfair prejudice, as found by the magistrate court. I.R.E. 403.

For these reasons, the district court erred in concluding that the magistrate court abused its discretion by excluding the toxicology evidence. The magistrate court's finding that the probative value of the report was substantially outweighed by its unfair prejudice was supported by substantial and competent evidence. No witness for Ochoa, based solely on the toxicology report, could describe whether and to what degree the victim was impaired. Cavanaugh only testified that methamphetamine *could* impair one's ability to operate a vehicle safely; he conceded that in a case like this, where the toxicology report shows a positive result for substances, he would not be able to say that person was impaired based solely on the toxicology report. Cavanaugh further noted that he was unable to evaluate the impairment level through physical and physiological indicators, such as driving pattern or a field sobriety test. Dr. Groben, too, opined that he could not determine from the toxicology report alone whether the substances detected in the victim's blood impaired or did not impair the victim at the time of the collision. Thus, admission of the toxicology report, without corroborating evidence to establish the victim's impairment, would likely invite inordinate speculation or invoke an emotional response by the jury based on evidence that could not support the conclusion the defense wanted them to reach. *Garcia*, 166 Idaho at 670, 462 P.3d at 1134.

The dissent focuses on the level of methamphetamine in the victim's blood and suggests that this alone is sufficient proof of impairment to make it relevant. However, there is absolutely no foundation in the record establishing that the levels of methamphetamine detected provided a scientific basis for concluding the victim was impaired. While the victim may have had 1.7 times the recommended "therapeutic dose" of methamphetamine in his bloodstream, without competent scientific testimony, the dissent has no basis to conclude that this alone is sufficient to show impairment. The following statement from the dissent perfectly illustrates the type of improper conclusions Ochoa wanted the jury to make had the report been admitted: "I believe that evidence of a victim's methamphetamine level reflecting 70% greater than the acceptable therapeutic range is certainly more than speculative evidence of impairment. It is objective evidence of the victim's impairment." Thus, the dissent, on its own, is willing to reach a scientific conclusion that no qualified expert was willing to testify to at trial. This is exactly the kind of speculation the Idaho Rules of Evidence, Rules 701(c) and 702 in particular, were designed to keep from the jury.

14

Accordingly, we reverse the district court's reversal of the magistrate court because the magistrate court did not abuse its discretion by excluding irrelevant or incompetent scientific evidence. Likewise, the magistrate court did not abuse its discretion in concluding that any marginal relevance of such evidence was substantially outweighed by the risk it would unfairly prejudice the jury. The magistrate court correctly perceived these issues as ones of discretion, acted within its discretion, applied the correct legal standards, and reached its decision through the exercise of reason. *Lunneborg*, 163 Idaho at 867, 421 P.3d at 198.

### B. The district court erred in reversing the magistrate court's denial of the motion for a continuance.

The State also contends that the district court erred by holding that the magistrate court abused its discretion by denying Ochoa's motion for a continuance before jury selection commenced on the first day of trial.[3] The State asserts that most of the delay in discovery was due to Ochoa's own fault, and regardless, she failed to establish prejudice. Where a motion to continue is predicated on the late disclosure of evidence, the moving party must show prejudice that resulted in the denial of a fair trial. *State v. Tapia*, 127 Idaho 249, 255, 899 P.2d 959, 965 (1995). The State maintains that Ochoa has failed to show prejudice by demonstrating how she was denied a fair trial through the late reception of the full toxicology report.

The decision to grant or deny a motion to continue rests within the sound discretion of the trial court:

> [W]here the denial of a motion to continue is attacked on the basis of late disclosure or discovery of evidence, the alleged tardiness of the disclosure must be shown to so prejudice the defendant's case preparation that a fair trial was denied. *State v. Fetterly*, 109 Idaho 766, 770, 710 P.2d 1202, 1206 (1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *State v. Smoot*, 99 Idaho 855, 858–59, 590 P.2d 1001, 1004–05 (1978). To prove prejudice, a defendant must show there is a reasonable probability that, but for the late disclosure of evidence, the result of the proceedings would have been different. *See, e.g., State v. Spradlin*, 119 Idaho 1030, 1034, 812 P.2d 744, 748 (Ct. App. 1991). Further, the bare claim that additional investigation could have been conducted is not sufficient to demonstrate unfair prejudice so as to support a motion for a continuance. *Id.*

*Tapia*, 127 Idaho at 255, 899 P.2d at 965.

---

[3] Although Ochoa argues on appeal that there were multiple motions to continue denied leading up to trial, the district court only concluded the magistrate court abused its discretion by denying the final motion Ochoa made the morning of trial. Therefore, this Court is limited to review the district court's decision on that basis. The magistrate court's decisions on the other continuance motions are not properly before this Court.

The district court erred when it reversed the magistrate court's decision to deny Ochoa's final motion to continue. The district court generally held that the late disclosure of the full report did not give Ochoa adequate time to prepare for trial. However, this is an oversimplification of the correct standard. To qualify for a continuance based on late discovery, a party must not only show that the late disclosure generally prejudiced the party, but they must also show that a fair trial was denied because there is a reasonable probability that the result of the proceedings would have been different had the additional time been granted. *Id.* Ochoa has failed to show prejudice to the magistrate court, the district court, and now to this Court.

On the morning of trial, Ochoa argued that she needed a continuance because there was information in the toxicology report that she "didn't get a chance to really explore more fully." However, merely claiming that additional investigation could have taken place "is not sufficient to demonstrate unfair prejudice so as to support a motion for a continuance." *Id*. Ochoa asserted that if she had more time, she could speak with an expert about whether the victim's methamphetamine level result reflected whether the victim was using methamphetamine close to the time he operated the motorcycle. The problem with this argument is that the disclosure on the morning the trial commenced was not the first time Ochoa was advised of the results of the toxicology report. The substance of the report had been disclosed months earlier. The late disclosure, while containing more pages supporting the results of the report, did not change those results. This is confirmed by the fact that the State filed a motion to exclude the methamphetamine result from the toxicology report over two months before trial.

On appeal to this Court, Ochoa also fails to show prejudice. Ochoa makes broad, sweeping statements about the toxicology report and its importance, but she fails to even assert how the proceedings would have been different had she been given a continuance. First, Ochoa had knowledge that the victim's toxicology reports showed the presence of controlled substances for months, when the report of Dr. Groben was first disclosed, yet she did not contact an expert. Ochoa points to no new facts in the full toxicology report that support her theory of the case. For example, Ochoa does not assert how her trial strategy would have been different, whether she would have called different witnesses, or if she would have offered different evidence at trial. During oral argument on appeal, Ochoa suggested for the first time that perhaps the methamphetamine—which raises the heart rate—interacted poorly with the adrenaline the medical personnel gave the victim in an attempt to stop the bleeding. She suggested that this could have caused the victim to bleed

16

out faster. While that argument, if substantiated by a qualified expert, may have been sufficient to prove prejudice, this argument was not made or supported below.

Importantly, all of the speculative arguments asserted by Ochoa are based solely on information contained in the summary report provided to Ochoa months before trial. Notably, Ochoa did not make the full 441 page report part of the record on appeal, so we cannot discern for ourselves how much new information was contained in it. Yet, she has been able to craft several theories related to causation by merely referencing the summary report she received. If the full report somehow provided new information and, thus, a basis for finding prejudice, Ochoa should have cited actual examples from the report. We must rule on the record of the case before us and the arguments that were actually made—not the arguments Ochoa now wishes she had raised. Simply put, Ochoa makes a bare claim on appeal that she was prejudiced by the late disclosure of the full toxicology report and that additional investigation was required before trial. As stated, these mere assertions are insufficient. Accordingly, we reverse the district court's decision to reverse the magistrate court's denial of Ochoa's motion for a continuance.

Similarly, Ochoa's alleged *Brady* violation is deficient. *Brady* requires all material exculpatory evidence known to the State or in its possession to be disclosed to the defendant. *Brady v. Maryland*, 373 U.S. 83 (1963); *Grube v. State*, 134 Idaho 24, 27, 995 P.2d 794, 797 (2000). " 'There are three [essential] components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Dunlap v. State*, 141 Idaho 50, 65, 106 P.3d 376, 391 (2004) (quoting *Strickler v. Green*, 527 U.S. 263, 282 (1999)). At trial on May 8, 2019, Ochoa argued that the full toxicology report contained exculpatory evidence that should have been disclosed earlier under *Brady.* Yet, she did not point to any information in that report she considered to be exculpatory evidence. She stated that this was because she did not have time to review the full report. However, two and a half years later, on appeal, Ochoa still has not identified any new exculpatory evidence in the report. Accordingly, we conclude that Ochoa has failed to articulate prejudice by describing how delayed access to the full toxicology report may have aided her defense.

In reviewing the district court's decision to reverse the trial court's denial of the continuance motion, we must independently review the record to determine whether there was an abuse of discretion. *Med. Recovery Servs., LLC,* 157 Idaho at 397, 336 P.3d at 804. In

independently reviewing this record, we cannot conclude that the magistrate court abused its discretion. Accordingly, we reverse the ruling of the district court.

### C. The district court erred in reversing the magistrate court's decision to allow the forensic pathologist to testify concerning the cause of death.

The State contends that the district court erred in concluding that the magistrate court should have excluded Dr. Groben's testimony regarding the victim's cause of death. The district court concluded that Dr. Groben had not formed his own opinion regarding the cause of death; rather, he merely relied on the findings of other physicians in the medical reports. Therefore, the district court held Dr. Groben's testimony was hearsay without a valid exception. The State argues that Dr. Groben's testimony was admissible under Idaho Rule of Evidence 703. Alternatively, even if the testimony were not admissible, any error from the admission of his testimony was harmless.

Generally, hearsay is inadmissible at trial unless there is a recognized exception. I.R.E. 802. " 'Hearsay is an out-of-court statement offered to prove the truth of the matter asserted.' " *Losee v. Deutsche Bank Nat'l Trust Co.,* 165 Idaho 883, 886, 454 P.3d 525, 528 (2019) (quoting *State v. Trevino*, 132 Idaho 888, 894, 980 P.2d 552, 558 (1999)). One exception to the hearsay bar regards expert testimony. Idaho Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion or inference on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Ochoa contends the district court got it right because Dr. Groben could not formulate his own opinion on the victim's death. For support, Ochoa relies on *State v. Watkins*, 148 Idaho 418, 224 P.3d 485 (2009).

In *Watkins*, a jury indicted the defendant for lewd conduct with a minor. *Id.* at 420, 224 P.3d at 487. As part of the State's case-in-chief, it called an expert witness to testify that tests performed at her laboratory showed the defendant's DNA was found in the semen on the minor victim's underwear and inside the condom. Additionally, the victim's DNA was found on the outside of the condom. *Id.* However, the expert did not receive the evidence or perform the tests herself; she relied on her colleague's notes to form her conclusion. *Id.* On appeal, this Court rejected the argument that the expert's testimony fell under the hearsay exception of Idaho Rule of Evidence 703. Idaho Rule of Evidence 703 allows experts to rely upon facts and data that are

not admissible on their own. However, the rule also states that those "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." I.R.E. 703. This language "serves to prevent an expert witness from serving as a conduit for the introduction of otherwise inadmissible evidence." *Id.* at 427, 224 P.3d at 494. This Court explained that the notes and statements of the expert's colleagues were not admitted for the proper and limited purpose of evaluating the hearsay statements as evidence; rather, the expert's hearsay testimony was offered to demonstrate the chain of custody of the evidence, the laboratory's testing methodology, and to identify the locations on the panties and condom on which the defendant's DNA was found. *Id.*

Here, the magistrate court allowed Dr. Groben's testimony under I.R.E. 703. Dr. Groben testified that he determined the victim's cause of death by conducting an exterior examination of the body and relying on the medical records of the physician who the performed surgery on the victim at the hospital. It is worth noting again Dr. Groban's explanation of his standard procedure in performing an autopsy:

> **THE STATE**: And then, did you perform any internal examination at all?
> **DR. GROBEN**: No.
> **THE STATE**: Why not?
> **DR. GROBEN**: [The treating physicians] had already done that at the hospital.
> **THE STATE**: So is it common for you to look at hospital records when you're determining cause of death?
> **DR. GROBEN**: Yes.
> **THE STATE**: How often do you do that when you're doing [an external examination]?
> **DR. GROBEN**: Whenever the case is appropriate, like this case.

After an objection by Ochoa, the State continued to question Dr. Groben outside the presence of the jury.

> **THE STATE**: And was it important to your conclusion in this case to look at the medical records?
> **DR. GROBEN**: Yes.
> **THE STATE**: And why was it important?
> **DR. GROBEN**: Because they documented it, the doctors in the hospital are the ones who are trying to save his life and documented his injuries. That's absolutely the best form of information I could get.
> **THE STATE**: But they didn't determine his cause of death?
> **DR. GROBEN**: No.
> **THE STATE**: You did?
> **DR. GROBEN**: Yes.

**THE STATE**: Based on the injuries he had when he was at the hospital?
**DR. GROBEN**: Right.

On cross-examination, Dr. Groben clarified the essential role the medical records play in ascertaining the cause of death:

**DEFENSE COUNSEL**: So Dr. Groben, you're saying that, even if you did an autopsy, you wouldn't be able to tell what the injuries were initially because they've been altered?
**DR. GROBEN**: Well, I would have -- I would have seen what they did and been able to get an idea. But it was obvious that he had injuries in his pelvic region. So I would have been able to see what they have done. But to know exactly what was there before they started, of course I would have to review the medical records. It would be malpractice if I didn't.
**DEFENSE COUNSEL**: From the internal -- the external examination of [the victim], were you able to determine, just based on that external examination, what the cause of death was?
**DR. GROBEN**: No.
**DEFENSE COUNSEL**: So you were -- you had to rely on those medical records?
**DR. GROBEN**: Yes.

Unlike in *Watkins*, Dr. Groben's testimony was not merely "serving as a conduit for the introduction of otherwise inadmissible evidence." *Id*. Dr. Groben detailed his specialized knowledge and training and described his methodology in cases like this. He testified that the facts and data in the medical records are facts and data he commonly relies on when formulating an opinion such as this. He explained that the information in such reports often contained a more accurate description of the victim's injuries than an autopsy because the surgeons' attempts to repair the injuries would alter the nature of the wounds. Dr. Groben noted the victim's extensive injuries: a collapsed lung, rib fractures, multiple fractures in his pelvis, and tearing of the arteries in his pelvis. He observed that the most serious injury was the tearing of the arteries in the victim's pelvis, which led to refractory hypotension (uncontrolled bleeding). Based on that information, Dr. Groben concluded the victim had died from blunt force trauma and blood loss related to the accident. Unlike the expert witness in *Watkins*, who testified to the *conclusions* her colleagues reached, Dr. Groben only testified as to the facts and data observed and recorded by his colleagues. Dr. Groben relied on the medical records to understand the injuries to the victim and then arrived at his own conclusion as to the cause of death. In short, there is no basis for Ochoa's assertion that Dr. Groben was merely serving as a conduit for another doctor's opinion in the medical records. Dr. Groben's conclusions were his own.

Therefore, we hold that the district court erred when it reversed the magistrate's decision to admit Dr. Groben's testimony. The record establishes that the magistrate court admitted the testimony after recognizing the discretionary nature of the decision. It then acted within its discretion, applied the right legal principles, and reached its decision by the exercise of reason. *Lunneborg*, 163 Idaho at 867, 421 P.3d at 198.

### D. Ochoa failed to preserve her due process argument for appeal.

In her brief in support of the petition for review and during oral argument before this Court, Ochoa argued that she was denied due process because she was not able to cross-examine the State's witnesses on the victim's toxicology. "Due process 'guarantees every defendant the right to a trial comporting with basic tenets of fundamental fairness.' " *State v. Dunlap*, 155 Idaho 345, 382, 313 P.3d 1, 38 (2012) (quoting *State v. Thorngren*, 149 Idaho 729, 735, 240 P.3d 575, 581 (2010)). However, Ochoa did not raise this due process argument in her brief on appeal to this Court. "A party waives an issue cited on appeal if either authority or argument is lacking, not just if both are lacking." *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996). The only mention of due process in Ochoa's brief is in a section heading stating that "[the admission of Dr. Groben's testimony] deprived Ms. Ochoa of due process. . . ." Merely stating an issue in a heading, without citing any authority or offering any supportive argument, is simply not sufficient to preserve an issue.

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court's decisions regarding the exclusion of the toxicology report, the denial of Ochoa's motions for a continuance, and the admission of Dr. Groben's testimony. We remand this matter to the district court with instructions to reinstate Ochoa's judgment of conviction.

Chief Justice BEVAN, Justice BRODY, and Justice Pro Tem HORTON **CONCUR.**


STEGNER, J., dissenting.

I respectfully dissent from the majority's opinion. I think the magistrate court erred by excluding the victim's toxicology results which showed the victim had methamphetamine in his system above the recommended therapeutic level and the expert's testimony concluding the

21

victim's ingestion of methamphetamine was a contributing factor in the accident which led to his death. As a result, I would affirm the decision of the district court and grant Ochoa a new trial.

The majority concludes that the victim's toxicology results were irrelevant because the toxicology report did "not make it more or less probable that the victim was impaired [or] not impaired." I respectfully disagree. What other evidence better indicates that the victim was impaired than a toxicology report indicating as much? I am hard-pressed to conclude anything would better reflect the victim's impairment. The majority also concludes, wrongly in my opinion, that because Ochoa did not have expert evidence that indicated the victim was impaired, the magistrate court correctly excluded the evidence. The majority errs in two specific respects: first, Ochoa had expert testimony tying the victim's methamphetamine use to his impairment; and second, even without the expert's opinion, the evidence was such that it should have been admitted.

At the hearing on the State's motion to exclude evidence of the victim's toxicology results, David Cavanaugh, an accident reconstructionist, testified. Cavanaugh was questioned about the impairing effects of methamphetamine in the victim at the time of the accident. Under cross-examination by the State, the following exchange occurred:

> Q: So in this case, can you say with a reasonable degree of certainty that the person who tried to avoid this collision on the motorcycle made that choice [to steer into the crash rather than away from it] because he was impaired from drugs?
>
> A: It[']s – in my opinion, it's a contributing factor. But no, it's not – it's not the – it's not necessarily, I should say, the reason he made a given decision, but I do believe it's a contributing factor.

In sum, the expert's opinion, "to a reasonable degree of certainty," was that methamphetamine in the victim's bloodstream was a contributing factor to the poor driving choices made by him.The majority's conclusion that "there must be competent evidence of [a victim's own] negligence" in order to admit the toxicology results was satisfied with this testimony.

Even though the experts for the State and Ochoa could not determine the *exact* degree of impairment of the victim, they both testified that "any amount" of methamphetamine would impair a driver to *some* degree. Driving under the influence of controlled substances is illegal in Idaho. *See* I.C. § 18-8004. Evidence that the victim had methamphetamine in his system is evidence of his own negligence in operating his motorcycle. The jury was permitted to hear of other factors indicating that the victim was impaired, including his rate of speed, his poor response to Ochoa's

vehicle crossing his lane of traffic (his steering to the left into her vehicle as opposed to steering to the right to avoid the collision), and the fact that he engaged only the rear brake of his motorcycle as opposed to engaging *both* the front and rear brake. However, the jury was not apprised of the fact that the victim's methamphetamine level was 70% higher than the maximum therapeutic level shortly after the time of the accident.[1] Cavanaugh's testimony that the victim's impairment was a "contributing factor" in the ensuing collision with Ochoa's vehicle is competent evidence of the victim's impairment, yet it was wrongly withheld from the jury's consideration.

The majority too narrowly construes the experts' opinions on impairment by focusing on their inability to determine the *precise* level of the victim's impairment. When read as a whole, Cavanaugh's and Madenford's testimony acknowledged the impairing effects of methamphetamine in the context of operating a motorcycle and how the victim's level of impairment contributed to his delayed response to Ochoa's oncoming vehicle. Such testimony is not only helpful to the jury in reaching its verdict but is also necessary in determining whether Ochoa herself was a significant cause of the victim's death. Sufficient evidence of the victim's impairment was elicited through Cavanaugh such that she should have been allowed to present that evidence to the jury for consideration in reaching its verdict.

The toxicology evidence should have been admitted even without the expert testimony because it was highly relevant and probative. It was established before trial that the victim had "a quantity of methamphetamine in his blood equal to 1.7 times a therapeutic dosage." The bar for relevant evidence is a low one; evidence need only tend to make a fact of consequence more or less probable. I.R.E. 401 ("Evidence is relevant if . . . it has *any* tendency to make a fact more or less probable.") (Italics added.) Rule 401 favors admissibility because "a court can exclude evidence as irrelevant *only* if it has *no* probative value." WRIGHT & MILLER, *Policy of Rule 401— The Good, The Bad, and The Ugly*, 22 FED. PRAC. & PROC. EVID. § 5162.2 (2d ed.) (Italics added.) The quantity of methamphetamine in the victim's blood (70% above the maximum therapeutic level) certainly makes it more probable that he was impaired because of that methamphetamine.

---

[1] Trooper Madenford testified that the acceptable therapeutic range for methamphetamine is 0-100, and that the victim's range was approximately 170. The toxicology report itself is not in the record, therefore it is unclear how the level of methamphetamine in the victim's blood was measured. However, methamphetamine is typically measured in terms of milligrams per liter of blood. *Amphetamine Screen (Blood)*, University of Rochester Medical Center Health Encyclopedia (last visited Nov. 3, 2021), available at https://www.urmc.rochester.edu/encycl opedia/content.aspx?contenttypeid=167&contentid=amphetamine_blood_screen.

Put another way, the fact of consequence, whether Ochoa was a significant cause of the victim's death, is made less probable given the victim had methamphetamine in his bloodstream at an amount 70% above the upper end of the drug's therapeutic range. *See id.* There are two possible conclusions that may be drawn from the victim having 70% more methamphetamine in his system than would be therapeutic: the first is that he was self-administering methamphetamine illegally; the second is that he was using methamphetamine in a way contraindicated by a valid prescription. Either of these two possibilities evidence culpable negligence on the part of the victim. As such, the victim's actions and impairment were clearly relevant factors that the jury should have been allowed to consider in determining whether Ochoa's conduct was a significant cause of the victim's death.

The majority notes that a comparison of multiple, potential causes "may put in perspective whether a cause was 'significant.'" The majority then concludes that the mere *possibility* that the victim was impaired is speculative. I believe that evidence of a victim's methamphetamine level reflecting 70% greater than the acceptable therapeutic range is certainly more than speculative evidence of impairment. It is objective evidence of the victim's impairment. If the State wanted to rebut this evidence, that is the State's prerogative. However, to reject its admission prevented Ochoa from presenting a defense to the charge against her. "A defendant in a criminal case has a constitutional right to present a defense, including the right to present the defendant's version of the facts." *State v. Thomas*, 157 Idaho 916, 919, 342 P.3d 628, 631 (2015) (holding that a district court erred in excluding evidence that was relevant to the defendant's theory of his case). This right is rooted in the Sixth Amendment and is a "fundamental element of due process of law." *State v. Meister*, 148 Idaho 236, 239, 220 P.3d 1055, 1058 (2009). Ochoa's right to present a defense was significantly hindered by the exclusion of the toxicology evidence.

The magistrate court abused its discretion by excluding the toxicology evidence. "Evidentiary decisions are reviewed under an abuse of discretion standard." *State v. Reyes*, No. 48628, 2021 WL 4848861, at *5 (Idaho Oct. 19, 2021) (quoting *State v. Anderson*, 162 Idaho 610, 617, 402 P.3d 1063, 1070 (2017)).

> When reviewing a lower court's decision for an abuse of discretion, this Court must analyze "whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted

24

consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason."

*State v. Bodenbach*, 165 Idaho 577, 591, 448 P.3d 1005, 1019 (2019) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)). The magistrate court did not act "consistently with the legal standards applicable" to it when it excluded the toxicology evidence. As noted, the threshold for admitting relevant evidence is low. *See* I.R.E. 401. "The Idaho Trial Handbook observes that Idaho Rule of Evidence 401 'requires only *minimal* relevance, treating evidence as relevant if it has *any* tendency to make facts more or less probable.'" *State v. Garcia*, 166 Idaho 661, 671 n.3, 462 P.3d 1125, 1135 n.3 (2020) (quoting D. Craig Lewis, *Idaho Trial Handbook* § 13:1 (2d ed. 2005)) (italics added). The magistrate court acted outside the boundaries of its discretion in failing to consider this evidentiary principle in excluding toxicology evidence. *See Bodenbach*, 165 Idaho at 591, 448 P.3d at 1019.

Because important evidence of the victim's consumption of methamphetamine shortly before the accident was wrongly excluded from the jury's consideration, I conclude the magistrate court abused its discretion in excluding this evidence. Accordingly, I would affirm the district court's decision to afford Ochoa a new trial because it correctly determined that the magistrate court erred in excluding evidence of the victim's toxicology results. Therefore, I respectfully dissent.