**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 49492**

| | |
|---|---|
| STATE OF IDAHO, )<br>)<br>Plaintiff-Respondent, )<br>)<br>v. )<br>)<br>DOUGLAS SHANE THOMPSON, )<br>)<br>Defendant-Appellant. )<br>_____ ) | Boise, May 2023 Term<br><br>Opinion Filed: December 19, 2023<br><br>Melanie Gagnepain, Clerk |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Steven J. Hippler, District Judge.

The decision of the district court is <u>reversed</u>, and the case is <u>remanded</u>.

Erik R. Lehtinen, Interim State Appellate Public Defender, Boise, for Appellant, Douglas Shane Thompson. Jenny Swinford argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent, State of Idaho. Kacey Jones argued.

_____

STEGNER, Justice.

Douglas Shane Thompson appeals the district court's decision to amend the scope of a no contact order which prohibited him from contacting his minor son for a period more than eight years. The no contact order was entered in connection with Thompson's conviction for domestic violence in the presence of a child. Thompson argues that the district court abused its discretion when it amended the no contact order because there was no evidence that Thompson posed a threat to his son and the no contact order violated his fundamental right to parent his son. For the reasons discussed below, we reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In October 2018, Thompson and Camille Broncheau were in a dating relationship and lived together with Thompson's sixteen-year-old daughter, D.T., Broncheau's fourteen-year-old daughter, C.B., and the couple's four-year-old son, R.T. On October 30, 2018, an altercation occurred in the family's home during which Thompson punched Broncheau on the right side of

1

her head. As a result, Broncheau lost consciousness. She also sustained bruising and swelling and was later diagnosed with a concussion. All three children were present in the home when Thompson struck Broncheau. D.T. and C.B. both witnessed Thompson strike Broncheau. R.T. was in a different room, and it is unclear from the record whether he heard or witnessed the altercation. Thompson was subsequently charged with domestic violence in the presence of a child in violation of Idaho Code section 18-918. A jury found him guilty in January 2020.

The altercation resulting in the domestic violence charge was not the first act of violence that occurred during Thompson's relationship with Broncheau. During the pre-sentence investigation, Broncheau and C.B. disclosed several previously unreported incidents that had allegedly occurred. Examples of such incidents included C.B. witnessing Thompson hit both her teenage brother and Broncheau, Thompson grabbing one of Broncheau's friends by the throat and pushing her against a refrigerator in C.B.'s presence, and Thompson slamming Broncheau's head into a car while she was holding R.T. as a baby.

In November 2018, at the inception of the underlying domestic violence charge, the district court entered a no contact order prohibiting Thompson from contacting Broncheau and the three children who were in the home at the time of the abuse: D.T., C.B., and—relevant here—R.T. Since the entry of the original no contact order, the district court has amended the order four times.

First, in January 2019, Broncheau requested that the no contact order be terminated because "my son [R.T.] misses his father and I would like to be able to communicate with him about him see[ing] his son." The district court amended the no contact order three months later in March 2019. While the amendment still prohibited all contact between Thompson and Broncheau, D.T., and C.B., it allowed Thompson to have supervised visits with R.T.

A month later, in April 2019, Broncheau requested that the no contact order be modified a second time to allow *unsupervised* visits between R.T. and Thompson. The district court agreed to grant the change and amended the no contact order later that month, removing R.T. as a protected person and allowing unsupervised visits with Thompson.

The third modification occurred in May 2020, upon sentencing, when the district court amended the no contact order to prohibit Thompson from contacting Broncheau directly but allowing Thompson to contact Broncheau via written communication. The district court sentenced Thompson to a term of ten years for the underlying domestic violence offense, with four years fixed, and retained jurisdiction. However, five months later, the district court relinquished

jurisdiction after it learned that Thompson had violated the no contact order by placing twenty-four phone calls to Broncheau over roughly two months, from August to September 2020. The district court then ordered that the underlying sentence be served.

At issue in this appeal is the fourth amendment to the no contact order. In November 2021, just over one year after the district court relinquished jurisdiction and executed Thompson's sentence, Broncheau requested that the no contact order again be changed to prohibit all contact between Thompson and her, R.T., and Broncheau's new husband, alleging that Thompson "continues to harass me and threaten me." Two months later in January 2022, after a hearing, the district court amended the order, prohibiting Thompson from contacting both Broncheau and R.T. That order expires on May 17, 2030, when R.T. will be fifteen years old.

At the hearing regarding the fourth amendment of the no contact order, Thompson acknowledged that "what communication there is[,] is not healthy" but then alleged that "all my communication up to this point has been with my son and my son only." Thompson requested that there be "mediation to [sic] where I'm still allowed to talk to my son [R.T.]." Despite Thompson's request, the district court granted the modification of the no contact order with no exceptions for either Broncheau or R.T. In so doing, the district court noted, "I did preside over this trial, I do remember it[,]" and reasoned that R.T. was also a victim of the underlying offense of domestic violence in the presence of a child, from which the no contact order originated. Thompson questioned the district court's decision to amend by noting his "moral obligation to be a father to this child [R.T.]." The district court assured Thompson that the no contact order expires, so it is only "for now" and that "there's always the right, if circumstances change, to petition for contact" if Thompson seeks to reinstitute contact with his son. Thompson timely appealed to this Court.

## II. STANDARD OF REVIEW

The district court's decision of whether to issue or modify a no contact order pursuant to Idaho Code section 18-920 is one of discretion. *State v. Lodge*, 166 Idaho 537, 539, 461 P.3d 819, 821 (2020).

> When reviewing a lower court's decision for an abuse of discretion, this Court must analyze "whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason."

*State v. Bodenbach*, 165 Idaho 577, 591, 448 P.3d 1005, 1019 (2019) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

3

### III. ANALYSIS

Thompson argues that the district court abused its discretion when it amended the no contact order to prohibit him from having any contact with his son, R.T. Thompson focuses on the latter two prongs of the abuse of discretion standard. First, Thompson argues that the district court did not exercise reason when it amended the no contact order for the fourth time because there had been no evidence presented to suggest that the change was necessary to protect R.T. Second, Thompson contends that the district court did not apply the correct legal standard to the specific choices available to it because the amended no contact order effectively terminated his parental rights.

Idaho Code section 18-920(1) provides that "[w]hen a person is charged with or convicted of an offense under section . . . 18-918 . . . , an order forbidding contact with another person may be issued." This Court has interpreted that statute to mean that the purpose of a "no contact order should be to protect current and future victims of crimes," and the district court has broad discretion over the issuance of such an order. *Lodge*, 166 Idaho at 539–40, 461 P.3d at 821–22. Thus, a no contact order may be properly entered and amended when there is substantial and competent evidence in the underlying record related to the offense that the order is being entered to protect current and future victims of the crimes enumerated in section 18-920. *See* I.C. § 18-920; *Lodge*, 166 Idaho at 540, 461 P.3d at 822.

For example, in *State v. Lodge*, Lodge was sentenced after pleading guilty to two counts of sexual battery of a minor child. 166 Idaho at 538–39, 461 P.3d at 820–21. The district court entered an amended no contact order prohibiting Lodge from having contact with the victims and "[all] minor children under 18," which included his own children. *Id.* at 539, 461 P.3d at 821 (alteration in original). Lodge appealed the decision, claiming the district court failed to exercise reason because there was no evidence that he presented a threat to his own children. *Id.* This Court disagreed, concluding that "[t]here were several findings both by the district court and in [the psychosexual evaluation in the underlying record], that support a conclusion that Lodge could be a threat to his children." *Id.* at 540, 461 P.3d at 822. Specifically, this Court noted previous sexual assaults committed by Lodge, Lodge's high likelihood of reoffending, and his improper communication with a teenage girl while awaiting sentencing. *Id.* Applying Idaho Code section 18-920, we said, "[w]hile there is nothing in the statute which suggests a limitation on *who* may be protected by a no contact order, the crimes referenced in Idaho Code section 18-920 suggest

4

that the no contact order should be to protect current and future victims of crimes." *Id.* (italics in original). Because the findings and recommendations in Lodge's evaluation supported the conclusion that he posed a threat to his children, we determined that the district court exercised reason and did not abuse its discretion. *Id.*

In *Lodge*, the Court was able to cite specific evidence that Lodge would be a threat to his children. Conversely here, the district court failed to articulate any evidence that demonstrated a change in circumstances to now hold that R.T. was a current or future victim of domestic violence by Thompson. The district court had previously amended the no contact order on two occasions, at Broncheau's request. The district court first allowed supervised visitation and later permitted unsupervised visitation between Thompson and R.T.

Then, at the hearing on Broncheau's request to amend the no contact order to prohibit all contact between Thompson and R.T., the State focused its argument exclusively on Thompson's conduct as it related to Broncheau, not R.T. For example, Broncheau requested a modification of the no contact order because Thompson "continues to harass *me* and threaten *me*." (Italics added.) At the hearing, she further stated that she "want[ed] to amend it so he can't talk *to me* at all. I don't want no [sic] communication or anything." (Italics added.) Counsel for the State further explained:

> My understanding from Ms. Broncheau is the exceptions have proved to be stressful *for her*, given the nature of the contact that he's had with her while he's been in prison, so I believe that's why she's asking the [c]ourt to remove the exceptions and no longer allow there to be any contact. I think it is warranted by the conduct in the case, as well as the [c]ourt honoring *her* wishes in being the victim of this case.

(Italics added.) In contrast to the focus on Broncheau, the only mention the State made regarding R.T. at the hearing was to inform the district court that Broncheau has full custody of R.T. and, therefore, has "the ability to make all the decisions regarding him." The State presented no evidence that Thompson's continued contact with R.T. negatively impacted R.T. in any way.

The district court ultimately amended the no contact order to prohibit all contact between Thompson and R.T. The district court explained that it would amend the no contact order, in part, because it considered R.T. a victim of the original crime. However, the district court did not explain what had changed regarding R.T. following its prior orders. If R.T. was a victim of the original crime, then he was a victim of the crime at the times the district court twice amended the order to permit contact. The district court failed to explain what change had occurred in the meantime— aside from Broncheau's latest request—that caused the district court to conclude that Thompson should have absolutely no contact with his son for more than eight years, when it had previously

5

allowed unsupervised visitation between father and son. The district court also appeared to place undue weight on the fact that Broncheau had full custody of R.T. but did not explain how this was relevant to R.T. being a current or future victim of domestic violence.[1] While the district court had broad discretion to modify the no contact order, it needed to explain its reasons for doing so on the record. As a result, we cannot evaluate whether it reached its decision through the exercise of reason.

A consequence of the district court not adequately explaining its reasons for amending the no contact order is that it precludes any future motion that Thompson may make to reinitiate contact with his son. The district court advised Thompson that he could petition to modify the no contact order if circumstances changed. However, the district court did not articulate what circumstances had given rise to its decision to prohibit all contact in the first place. It stated that it considered R.T. a victim of the original crime, but that is a static factor and not a circumstance that is subject to change. That fact was also true when the district court authorized unsupervised contact between R.T. and Thompson. So how is Thompson to know whether those circumstances have changed sufficiently to give him a basis to ask the district court to reinitiate contact with his son? If the basis for the district court's decision was the adverse effects that domestic violence can have on children, will those circumstances ever change? Ultimately, the district court's suggestion that Thompson could revisit the no contact order appears to be illusory given that Thompson was not apprised of what he did wrong to warrant the modification of the no contact order between him and R.T, nor has Thompson been advised what behavior he would have to change to be able to contact R.T. Without an explanation of the district court's reasons for modifying the no contact order, it is impossible to know what circumstances would need to change before Thompson may seek contact with his son.

We understand Broncheau's wish to be free from all contact with Thompson, and we acknowledge that facilitating Thompson's contact with R.T. might create a hardship for her. However, Broncheau's wishes, standing alone, do not support the district court's decision to cut off *all* contact between Thompson and his son, especially for such a lengthy period. The district

---

[1] Full custody is a determination that was presumably made by a judge in a family law setting. In that setting, the family law judge would be tasked with determining what is in the best interest of the child. While the family law judge apparently determined Broncheau should have full custody of R.T., there is no suggestion that the family law judge would have also determined that it was in the best interest of R.T. that he have absolutely no contact with his father for the next eight years.

court may only grant such a motion if it determines on the record, and based on substantial and competent evidence, that R.T. is a current or future victim of domestic violence. Because that did not occur in this case, we cannot affirm the no contact order to the extent it precludes Thompson from any contact whatsoever with his son. Accordingly, we hold that the district court did not "reach[] its decision by the exercise of reason." *Bodenbach*, 165 Idaho at 591, 448 P.3d at 1019 (quoting *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194). Therefore, the district court abused its discretion in amending the no contact order in the way that it did.

Thompson also argues that the district court failed to apply the correct legal standards by terminating his fundamental right to parent R.T. through the amended no contact order. The Fourteenth Amendment to the United States Constitution protects the fundamental right of parents "to maintain a familial relationship . . . ." *Nelson v. Evans*, 170 Idaho 887, 899, 517 P.3d 816, 828 (2022); *Matter of Doe Children*, 164 Idaho 486, 489, 432 P.3d 35, 38 (2018). Thompson argues that by amending the no contact order to prohibit all contact with R.T., the district court effectively terminated his parental rights. To terminate parental rights, the State must support its allegations by clear and convincing evidence. *State v. Doe*, 144 Idaho 534, 536, 164 P.3d 814, 816 (2007) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982)). "Clear and convincing evidence" requires "that the thing to be proved is highly probable or reasonably certain." *In re Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006) (citation omitted). The termination court must also find termination is in the best interest of the child. I.C. § 16-2005.

On appeal, Thompson argues the State presented no evidence about R.T.'s best interests or the need to protect R.T. from harm that would support the termination of his parental rights. However, below, Thompson's attorney only made general references to Thompson wanting "to have that right of communication" with R.T. and the denial of "his moral obligation to be a father." We do not find these statements sufficient to support the argument Thompson now makes on appeal. It is well established this Court "can hear refined legal arguments regarding an issue heard and decided by the court below, but in fairness to the district court and the opposing party, we cannot usurp the district court's role by deciding new legal issues in the first instance." *Siercke v. Siercke*, 167 Idaho 709, 716, 476 P.3d 376, 383 (2020) (citing *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2018)). In other words, "[a] groomed horse is expected on appeal, but a different horse is forbidden. *Id.*

Thompson's vague references below did not put the State or the district court in a position to respond to the allegation that the no contact order impacts Thompson's fundamental right to parent. That said, we appreciate the nuanced nature of proceedings that include a no contact order that is expanded to include a child of the person against whom the no contact order is sought. At a hearing to amend a previous no contact order, Judge Hippler commented that he is "not a family law judge" and that he can only "do the best [he] can." These remarks highlight the difficulties that arise when a judge who does not regularly deal with family law issues is put in a position to analyze the complex, often competing, interests involved. Still, because the issue has not been sufficiently preserved, we leave for another day the question of whether clear and convincing evidence is required to support a no contact order which prohibits a father from having any contact with his son for more than eight years and substantially impairs that father's parental rights.

## IV. CONCLUSION

For the reasons set forth above, the decision of the district court to amend the no contact order is reversed. The case is remanded to the district court for further proceedings.

Justices MOELLER and ZAHN CONCUR.

BRODY, Justice, dissenting.

I dissent. To begin with, I disagree with the majority's conclusion that the district court had an obligation to articulate evidence that demonstrated a change in circumstances to now hold that RT is a current victim or likely a future victim of domestic violence by Thompson. The fact that the district court exercised its discretion to modify the no contact order in the past to allow some contact between Thompson and RT does not mean that RT is no longer a victim and somehow falls outside the protections of Idaho Code section 18-920(1) unless there is a change in circumstances. He is a victim and likely to be a future victim given what we know about Thompson's propensities.

While there may be some ambiguity in the record about whether RT was present when the domestic violence in this case occurred, the fact that RT was not the target of Thompson's violence does not take him outside the protections of Idaho Code section 18-920(1). The Court has long recognized that domestic violence harms children, even when the children are not the targets of the physical abuse, because exposure to abuse creates an unstable and dangerous home environment. *Interest of Doe I*, 166 Idaho 68, 77, 454 P.3d 1151, 1160 (2019); *see also In re Doe*, 143 Idaho 343, 347, 144 P.3d 597, 601 (2006) ("[I]nfliction of perpetual domestic violence, even if not directed at the children, supports a finding of parental neglect, as it provides for an unstable

and dangerous home environment."). Exposure to domestic violence is associated with significant mental health impairments in children including psychological, social, emotional, and behavioral problems. C. Nadine Wathen and Harriet L. MacMillan, *Children's Exposure to Intimate Partner Violence: Impacts and Interventions*, 18 PEDIATRIC CHILD HEALTH, 419 (2013). The psychological and physical harms are well understood:

> [C]hildren who grow up in homes beset by domestic violence are at greater risk of experiencing anxiety, depression, problems in school, and teenage pregnancy, while also engaging in substance abuse and attempts of suicide. Children exposed to family violence often suffer from symptoms akin to those of post-traumatic stress disorder, such as nightmares and bed-wetting. Numerous psychological studies have pointed to the impact that exposure to domestic violence can have on children; the studies have shown that clinical problematic child behavior can lead to a misdiagnosis of attention deficit disorder when the true source of such problems is in the exposure to domestic violence. Children who suffer childhood trauma, including witnessing incidents of domestic violence, have a greater risk of developing serious health problems in adulthood. Such health problems include substance abuse, tobacco use, obesity, heart disease, and depression, and a higher risk for unintended pregnancy.

Terrence Rogers, *Exposure to Domestic Violence as a Form of Child Abuse Under Domestic and International Law*, 34 WOMEN'S RTS. L. REP. 358, 363 (2013). Thompson himself stated during the hearing to amend the no contact order that "what communication there is is [sic] not healthy" despite also claiming he had only been communicating with his son.

When I read the transcript of the district court's decision, I do not read a decision that lacks reason or reflects arbitrary decision-making. *See State v. Le Veque*, 164 Idaho 110, 115, 426 P.3d 461, 466 (2018) ("The hallmark of a discretionary decision that is not reached by an exercise of reason is arbitrariness."). Rather, I read a decision that was careful and deliberate based on the long history of Thompson's ongoing refusals to obey court orders.

The district court judge noted from the outset of his ruling that he remembered Thompson. The judge presided over Thompson's trial, imposed sentence, made the decision to retain jurisdiction over Thompson while he went through a rider program, and made the decision to relinquish jurisdiction after learning that Thompson contacted Broncheau by telephone twenty-four times in less than two months in violation of the court's no contact order. That same district court judge modified the no contact order–not once–but four times.

While the stated length of the modified no contact order is long, the district court also communicated to Thompson that it did not have to be permanent if he complied. There is nothing illusory about the district court's statement:

Thompson:     So your Honor, even though I have a moral obligation to be a father to this child, I'm still being denied of it?

Court:     Your conduct excluded you from having contact with this child, and I'm granting that no-contact order at this time.

You know, it's in place until it expires, and there's always the right, if circumstances change, to petition for contact, but for now it's no contact.

The district court sent Thompson a strong message when it modified the no contact order. The district court judge who has handled the case over the last five years is the person who is in the best position to make that call, and I would not second-guess it. I would affirm the district court's decision.

BEVAN, Chief Justice, dissenting.

I join in Justice Brody's dissent and write separately simply to note that the decision the majority reverses today was made by the district court while exercising its broad discretion in a case that the court had lived through in several ways, as identified by Justice Brody. Such decisions are entitled to great weight and should not be reversed in a de novo fashion under the guise of analysis of one of the prongs of the *Lunneborg* test. This Court has noted previously that the factual inquiries surrounding a trial judge's exercise of discretion are best left to that judge to resolve, rather than being second guessed by this Court:

> [T]he factual inquiries required in determining whether sanctions should be awarded are . . . a core part of the inquiry. This Court will not undertake a de novo legal review of [the question before us] under the guise of the legal prong of the standard of review equation. That would amount to this Court simply second guessing the trial court's discretionary decisions. Indeed, when reviewing these questions, " '[i]t is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule' rather than 'indulge in review by hindsight.' " *United States v. Tsarnaev*, ⸺ U.S. ⸺, 142 S. Ct. 1024, 1039 (2022) (quoting *Old Chief v. United States*, 519 U.S. 172, 182, n.6 (1997)).

*Gilbert v. Radnovich*, 171 Idaho 566, 524 P.3d 397, 403–04 (2023) (emphasis in original).

While *Gilbert* involved analysis of a discretionary decision to award attorney fees, we noted there that, in making discretionary decisions, "a trial 'judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record[.]' " *Id.* (quoting *Tsarnaev*, 142 S. Ct. at 1034). "These are factual determinations left to the discretion of the trial court who has a front-row seat to the alleged misconduct for which sanctions are sought. And '[t]hat discretion does not vanish' because the trial judge reaches a decision the parties disagree with." *Id.* at ___, 524 P.3d at 404 (alterations original).

Viewing the record here against this paradigm, I would affirm the discretionary decision made by the district court based on the factors cited by Justice Brody in her dissent.